The Hecht Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 36603. Filed November 14, 1958.

*I. Herman Sher, Esq.*, and *Martin A. Roeder, Esq.*, for the petitioner. *George J. LeBlanc, Esq.*, and *James Q. Smith, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent disallowed the petitioner's applications for excess profits tax relief under sections 711 and 722 of the Internal Revenue Code of 1939 [1] for the fiscal years ended January 31, 1941 through 1946. The questions presented are whether the petitioner qualifies for relief under section 722 (b) (4) by reason of alleged changes in capacity for production or operation consummated after December 31, 1939, as a result of a course of action to which the petitioner was committed prior to January 1, 1940; whether the petitioner's business reached by the end of the base period the earning level which it would have reached had such changes been made 2 years earlier; and whether the petitioner has established a fair and just amount representing normal earnings to be used as a constructive average base period net income. There is also the question as to whether the petitioner is entitled to section 722 (b) (4) relief because of a difference in the ratio of its nonborrowed capital to total capital during the base period.

#### FINDINGS OF FACT.

Some of the facts have been stipulated and they are herein incorporated by this reference.

Petitioner was incorporated under the laws of Maryland on February 1, 1918, when it succeeded to the retail department store business first established about 1865. The predecessor of the petitioner established a department store in Washington, D. C., which was acquired by the petitioner upon its incorporation. The petitioner has, since before 1936, also owned and operated department stores in Baltimore, Maryland, and New York, New York. Its principal office is in Baltimore and its Federal tax returns for the years here involved were filed with the then collector of internal revenue for the district of Maryland. The petitioner, at all times material herein, kept its books and filed its Federal income and excess profits tax returns on an accrual basis, with a fiscal year ending January 31, except that its income from installment sales before the year ended January 31, 1947, has, for income tax purposes (but not for purposes of excess profits taxes for the years ended January 31, 1941 to 1946, both inclusive), been computed upon the installment basis of accounting. Petitioner is entitled to use the excess profits tax credit based on income pursuant to section 713 for each of the years before us.

Respondent determined the petitioner's excess profits net income, the average base period net income, and the excess profits credit based on income, without the disallowance of any deductions under section 711 (b) (1) (J) and without the allowance of any section 722 relief, as follows:

---

[1] All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.

| Year ended January 31 | Excess profits net income | Average base period net income | Excess profits credit |
|---|---|---|---|
| 1941 | $1,980,611.27 | $1,674,192.84 | $1,597,903.81 |
| 1942 | 3,708,079.38 | 2,094,084.37 | 1,989,380.15 |
| 1943 | 3,549,840.77 | 2,093,952.26 | 1,989,254.65 |
| 1944 | 4,451,254.06 | 2,093,952.26 | 1,983,356.28 |
| 1945 | 5,225,726.14 | 2,093,952.26 | 1,942,540.62 |
| 1946 | 5,064,520.40 | 2,093,952.26 | 1,955,826.10 |

The petitioner, in its applications for relief, claimed a constructive average base period net income as follows:

| Year ended January 31 | Claimed in application | |
|---|---|---|
| | Constructive average base period net income | Refund |
| 1941 | $1,781,210.74 | $42,410.87 |
| 1942 | 2,517,193.09 | 254,701.78 |
| 1943 | 2,806,624.16 | 546,219.23 |
| 1944 | 2,806,624.16 | 612,209.57 |
| 1945 | 2,806,624.16 | 578,867.75 |
| 1946 | 2,806,624.16 | 530,273.10 |

The net sales, gross profit on sales, and the adjusted net income of petitioner's Washington store for each of the fiscal years 1935 through 1946, were as follows:

| Year ended January 31 | Net sales | Gross profit on sales | Net income |
|---|---|---|---|
| 1935 | $9,204,651 | $3,323,671 | $608,947 |
| 1936 | 10,871,115 | 3,974,129 | 922,278 |
| 1937 | 11,793,889 | 4,372,950 | 1,058,327 |
| 1938 | 11,582,375 | 4,357,461 | 1,025,571 |
| 1939 | 11,766,119 | 4,537,159 | 1,081,900 |
| 1940 | 12,112,071 | 4,656,759 | 1,062,317 |
| 1941 | 14,007,609 | 5,419,776 | 1,459,927 |
| 1942 | 16,964,472 | 6,762,039 | 1,787,226 |
| 1943 | 20,123,781 | 7,932,550 | 2,073,467 |
| 1944 | 21,728,809 | 8,394,962 | 2,627,741 |
| 1945 | 24,516,553 | 9,502,773 | 3,187,005 |
| 1946 | 27,041,652 | 10,226,083 | 3,081,479 |

The selling space available to the Washington store and sales per square foot during the years pertinent here were as follows:

| Fiscal year ended January 31 | Aggregate average square footage | Sales per square foot | Fiscal year ended January 31 | Aggregate average square footage | Sales per square foot |
|---|---|---|---|---|---|
| 1935 | 183,476 | 50 | 1941 | 196,429 | 71 |
| 1936 | 185,964 | 58 | 1942 | 224,829 | 75 |
| 1937 | 187,429 | 63 | 1943 | 266,406 | 76 |
| 1938 | 190,559 | 61 | 1944 | 266,882 | 81 |
| 1939 | 198,548 | 59 | 1945 | 259,103 | 95 |
| 1940 | 193,072 | 63 | 1946 | 263,050 | 103 |

During the fiscal years 1935–1946, the total annual transactions and the average sales for petitioner's Washington store were as follows:

| Fiscal year ended January 31 | Number of transactions | Average sales | Fiscal year ended January 31 | Number of transactions | Average sales |
|---|---|---|---|---|---|
| 1935 | 3, 071, 421 | $3. 34 | 1941 | 4, 379, 108 | $3. 50 |
| 1936 | 3, 437, 170 | 3. 54 | 1942 | 4, 626, 712 | 4. 00 |
| 1937 | 3, 583, 195 | 3. 64 | 1943 | 4, 754, 974 | 4. 57 |
| 1938 | 3, 415, 754 | 3. 74 | 1944 | 4, 886, 748 | 4. 72 |
| 1939 | 3, 610, 722 | 3. 58 | 1945 | 5, 694, 279 | 4. 53 |
| 1940 | 3, 789, 638 | 3. 50 | 1946 | 6, 183, 159 | 4. 63 |

During all times material here, the petitioner's stores were independently controlled, and each store had its own organization and accounting. It was the petitioner's policy to maintain an autonomous operation for the stores in each city and the manager of the business in the particular city was in complete control of the store or stores in that city except for large capital expenditures which required an "appropriation" by the petitioner's board of directors. Since at least the fiscal year ended January 31, 1937, the petitioner's Washington store, for the most part, has dealt in the middle-class type of merchandise, with an emphasis on national brand merchandise.

Petitioner completed the so-called Main Building of its Washington store, at the corner of F and Seventh Streets, in November 1925. It consisted of 7 stories and a basement. As of February 1, 1936, the petitioner's Washington store, generally, was in the Main Building, the Old Seventh Street Building, in the Pacific, Owens and Music Buildings on F Street, and in the Peoples Life Insurance Building on Sixth Street, in the Rex Building, which was to the rear of the Main Building, and in rented space in the American Insurance and the Second National Bank Buildings (on Seventh Street). The Washington store also had a Bargain Annex on E Street and a parking garage on the corner of E and Sixth Streets.

In 1936 the petitioner constructed a new warehouse a few miles from its Washington store at a cost of $899,100, and in the fiscal years 1937 through 1942 also made other net additions at cost, as follows:

| Fiscal year ended January 31 | Amount |
|---|---|
| 1937 | $49, 355. 47 |
| 1938 | 33, 801. 21 |
| 1939 | 0 |
| 1940 | 9, 487. 50 |
| 1941 | 70, 263. 50 |
| 1942 | 613, 678. 28 |

Early in 1936 the petitioner made an "appropriation" for the air conditioning of the basement, first, second, and third floors of the Main

Building at a cost of $200,000, and in 1938 made an "appropriation" for the air conditioning of the rest of the Main Building at a cost of $150,000. In September 1940 the petitioner "appropriated" approximately $144,000 to cover the cost of remodeling, repairing, and making related changes in the Pacific, Owens and Music Buildings. At the same time the petitioner "appropriated" approximately $160,000 to air condition the proposed new Bargain Annex and the Pacific, Owens and Music Buildings.

The management of the Washington store during the base years was aggressive and the top executives were well recognized in the merchandizing field. As early as January 1935 the management of the Washington store felt that the store was so underspaced that the various departments could not grow properly. In a report dated January 1935, presented by the management of the Washington store to petitioner's top management, this lack of space was stressed and a recommendation was made for a building of 5 floors and a basement on the site of the Pacific, Owens and Music Buildings which adjoined the Main Building on F Street. This report estimated the cost of the new building at $400,000, with an additional $75,000 for fixtures. The report estimated that this new space would bring increased sales in the vicinity of $3,000,000, bringing total sales for the Washington store to approximately $12,000,000.

Abbott, Merkt & Company, architects and engineers (hereinafter called Abbott), was first engaged by the petitioner's Washington store in 1931 which, since that time, has used them for various services. A copy of the January 1935 report prepared by the Washington store management was submitted to Abbott for the purpose of making a study and preparing a report on a new building, consisting of 7 floors and a basement. Abbott prepared several possible plans and late in 1935 prepared a fourth plan which stated that the new building would contain net sales areas aggregating 105,640 square feet, and would cost, exclusive of air conditioning and vertical transportation, the amount of $800,000. The petitioner's top management rejected this plan because regulations of the District of Columbia would prevent certain mechanical installations made necessary by the plan, and also because the plan would necessitate certain alley changes which would entail getting the consent of every property owner on square 456, which was the city block where petitioner's Washington store was located, as well as the District of Columbia. Also, the management of the Washington store was considering the feasibility of erecting the new building to the rear of the Main Building and extending further toward E Street.

Sometime in 1937 or 1938 the petitioner considered a plan prepared by Abbott for the construction of a new building to the rear of the

Main Building. The new building was to have 7 floors with 12,425 square feet of space per floor, a basement over the entire area, and a subbasement over a part of the area. Early in 1939 the petitioner also considered plans to build a new Bargain Annex to the rear of the proposed 7-story building. The new Bargain Annex, which was to extend to E Street, was to have 2 floors and a basement, with 13,344 square feet of space per floor, or a total of approximately 40,000 square feet. There was to be a connection between the new buildings and the Main Building. On January 26, 1939, petitioner "appropriated" $500,000 for the estimated cost of the new building immediately to the rear of the Main Building, and on December 28, 1939, petitioner also "appropriated" $300,000 for the construction of the new annex.

To construct the proposed buildings to the rear of the Main Building, it was necessary for the petitioner to close one existing alley, in the western section of the block, which could be done if the petitioner acquired lot 806. It was also necessary to open a new alley elsewhere in the eastern section of the block. Early in 1939 the petitioner engaged a Washington, D. C., law firm for the purpose of obtaining the approval of the District of Columbia as to certain alley changes in connection with the contemplated building program. The alley in the west section was closed late in 1940, when the petitioner dedicated to the District of Columbia lot 806 and a portion of lot 804, which lots the petitioner had in the meantime purchased. Subsequent to 1936 the management of the Washington store undertook to get the consent of the property owners for any necessary alley changes, and, if necessary to purchase lots. Lot 806 was purchased early in 1939. Late in 1939 the owner of lot 804 indicated that she would sell her lot to the petitioner, and on December 28, 1939, the petitioner's board of directors "appropriated" $55,000 for the purchase of this lot, which was acquired about the middle of 1940. Late in 1939 the owners of lots 821, 822, and 823 were objecting to alley relocation and in 1940 the petitioner purchased lots 821 and 822. By the latter part of 1940 the owners of the lots in square 456, including lot 823, consented to the alley relocation, and the alley relocation was also approved by the District of Columbia.

By the middle of 1939 Abbott had prepared plans, as well as a suggested schedule of construction, for a 7-story building, with a basement, subbasement, and a penthouse, to the rear of the Main Building and a new Bargain Annex with a basement, 2 floors, and a penthouse. The new 7-story building was planned to provide a gain in space of 108,885 gross square feet, or a gain in net sales area of 75,270 square feet. The estimated cost of the 7-story building, with air conditioning and 3 passenger elevators, was $1,000,000. The new Bargain Annex was to have a gross area of 20,720 square feet. Abbott's suggested plan of construction, under date of July 17, 1939,

called for construction of the annex first, by January 1, 1940, followed by the construction of the larger building. By November 1939, the plans for the annex had changed, calling for a 3-floor and a basement, and the estimated cost was $287,168.

On May 17, 1940, Abbott presented to the petitioner a revised estimated cost of $1,622,000 for the building program. In July 1940 the petitioner decided on a plan for the construction of the new Bargain Annex, to consist of a basement and 4 floors, with a fifth floor to be considered in the future. At about this same time, considerable foundation difficulties were foreseen by Abbott unless the depth of the proposed new building were shortened. Actual construction on the annex building was begun in the fall of 1940, at which time the petitioner had decided on a building with a basement and 5 floors. Sometime after the beginning of this construction in 1940 the entire building project was designated as the new E Street Building, which, as ultimately constructed, had 5 floors and a basement. It also had 2 new passenger elevators. Petitioner was able to use a part of the new E Street Building around the middle of 1941, and completely occupied it before September 1, 1941. The official opening of the new building was delayed to November of that year in order to tie it in with the store's official Christmas opening.

A comparison of the departmental square feet of selling space for the years ended January 31, 1940 to 1943, the first full year after the addition of the new space, shows the following:

| Space increase | Number of departments | Additional square feet of selling space |
|---|---|---|
| Over 50 per cent | 33 | 47,982 |
| Between 25 and 50 per cent | 17 | 13,494 |
| Less than 25 per cent | 26 | 7,821 |
| No increase (or decrease) | 17 | —261 |
| Total | 93 | 69,036 |

The new E Street Building, when finally completed, resulted in the addition of 73,334 square feet of additional selling space to the Washington store.

Petitioner was committed, prior to January 1, 1940, to construct a new building which would provide additional selling space of at least 73,334 square feet. Because of this change in the character of the petitioner's business during the base period, its actual average base period net income does not reflect the normal operation during the base period of the business as changed.

OPINION.

Section 722 (b) (4) provides that the excess profits tax "shall be considered to be excessive and discriminatory in the case of a taxpayer

entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because * * * the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business." This section also provides that any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, shall be deemed to be a change on December 31, 1939, in the character of the business.

Petitioner contends that, prior to January 1, 1940, it was committed to make additions to its Washington store which added 73,334 square feet of selling space to its existing space. Respondent concedes that the petitioner was committed, prior to that date, to construct a new E Street building with the addition of 33,000 square feet of selling space.

In its petition in this case petitioner alleged in paragraph (5) (1): "As a result of a course of action to which the petitioner was committed prior to January 1, 1940, the petitioner, in September, 1941, completed the construction of a new five floor building as an addition to its Washington, D. C., store." The paragraph went on to allege the addition cost approximately $1,515,574 and that it added at least 70,665 square feet of selling space to the store which was a substantial increase in its capacity for the operation of its business within the meaning of section 722 (b) (4) and therefore its actual base period net income does not reflect the normal operation for the entire base period of its business. Respondent, in his answer filed October 31, 1951, stated in paragraph 5 (1), as follows:

Admits that as a result of a course of action to which the petitioner was committed prior to January 1, 1940, the petitioner, in September, 1941, completed the construction of a new five floor building as an addition to its Washington, D. C., store. Denies the remaining allegations and conclusions contained in subparagraph (1) of paragraph 5 of the petition.

It would seem that the above would constitute a pleading admission on the part of respondent that petitioner was, prior to January 1, 1940, committed to the building of the 5-story addition, that it actually did build in September 1941. Admittedly, this building addition was 73,334 square feet of selling space. But respondent interpreted its pleading as merely the admission that the petitioner, prior to January 1, 1940, was committed to the building of a building, but not to the size thereof, and at the close of the trial respondent filed an amendment to his answer, said to be to conform to proof, wherein he pleads

the commitment prior to January 1, 1940, was for a building containing approximately 33,000 square feet of selling space.

The evidence establishes that, prior to January 1, 1940, the petitioner was committed to construct a new building on square 456 which would give it additional selling space of 73,334 square feet. In Regulations 112, section 35.722–3 (d) (5), the respondent has specified that "a commitment may be proved by a contract for the construction, purchase, or other acquisition of facilities resulting in such change, by the expenditure of money in the commencement of the desired change, by the institution of legal action looking toward such change, or by any other change in position unequivocally establishing the intent to make the change and commitment to a course of action leading to such change." See also E. P. C. 15, 1947–1 C. B. 89, amending Bulletin on Section 722, p. 58: "Progress to the point where the taxpayer could not withdraw without substantial detriment may be given substantial weight in determining whether or not taxpayer has committed itself * * *. On the other hand, commitment claims are not to be rejected solely on the ground that taxpayers which have otherwise complied with all of the essentials in commitment cases may, nevertheless, be in a position where they might have withdrawn without substantial detriment prior to January 1, 1940." This language, we feel, aptly reflects the intent of the Senate Finance Committee in S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 201–202:

A course of action to which the taxpayer was committed may be evidenced by a contract, the expenditure of money in the commencement of the desired changes, or other changes in position unequivocally establishing the intent to make the changes. * * *

As early as 1935 the management of the Washington store recognized that it needed more space. It is clear, from all the evidence, that the growth of the Washington business was seriously hindered by the lack of selling space. A comparison of the statistics of the Washington store with department stores elsewhere brings out this lack of space quite forcibly as does the considered judgment of its highly experienced management. Petitioner engaged a firm of architects and engineers who specialized in department stores, and there ensued a series of plans which culminated, in 1939, in a plan, together with a suggested schedule of construction, for a 7-story building that would provide an additional net sales area of 75,270 square feet. Petitioner, also in 1939, purchased lot 806 with the building program in mind, and the petitioner engaged a law firm to get the consent of the District of Columbia to certain alley changes which were also necessary in the contemplated construction of a new building. We think that this expenditure of money for services, the acquisition of the lot, and the institution of legal action looking toward the contemplated change, show a definite commitment, within the intent of the statute

and the regulations, prior to January 1, 1940, to construct the new building that would provide additional selling space of at least 73,334 square feet.

In *Studio Theatre Inc.*, 18 T. C. 548, we pointed out that the taxpayer's failure, in that case, to contract during the base period for the necessary alterations incident to expansion was not necessarily conclusive of the question of commitment. We said:

Even if we were to assume, however, that petitioner did not proceed during the base period to a point from which it could not withdraw without substantial detriment, we would still be satisfied, on all the facts and circumstances, that it had adopted a course of action within the statute which resulted in the enlargement of the theatre. If petitioner failed to proceed beyond such a point, it was due to the difficulties which it encountered without fault or design on its part, and failure to progress further under those circumstances was not evidence of a change in its plans. The record as a whole shows in our opinion that petitioner made "changes in position unequivocally establishing the intent to make the changes [in capacity for production or operation]," and that is enough to establish the "commitment" required by the statute. S. Rept. No. 1631, 77th Cong., 2d Sess., p. 202; see also Treasury Regulations 112, sec. 35.722–3 (d).

Nor do we think it is material that the petitioner, in 1939, was thinking of a 7-story building with a Bargain Annex consisting of 2, 3, or 4 floors, and that the new E Street Building, as finally constructed, consisted of 5 floors throughout. Changes in the relative size of the 2 units were made necessary when it was discovered that the foundation presented unforeseen difficulties. All that took place was that 2 floors were cut off the larger building and added to the Bargain Annex. But the overall space, which was committed for in 1939, remained approximately the same.

To qualify for relief under section 722 (b), the petitioner must show not only that it made a change in the character of its business during the base period, but must also prove that, because of such change, its actual average base period net income does not reflect the normal operation during the base period of the business as changed, and it must also establish a fair and just amount representing normal base period earnings for the changed business.

Petitioner claims that, under the 2-year push-back rule, it would have attained additional sales from the use of the new E Street Building by the end of the base period in the amount of $4,000,000, and that its constructive additional normal net income based on such additional sales, as of the end of the base period, would be $629,450. Petitioner used an index of 99.50, based upon the actual net income of the Washington store over the base period, for purposes of backcasting. Petitioner also makes the assumption, in the application of the variable credit rule, that 59 per cent of the constructive additional average base period net income of its Washington store should

be allocated to the excess profits tax year ended January 31, 1942. With these various assumptions, the petitioner has computed a constructive average base period net income of $1,703,794.40 for the fiscal year 1941, $2,493,204.93 for the fiscal year 1942, and $2,749,856.82 for the fiscal years 1943, 1944, 1945, and 1946.

We are not persuaded that the petitioner's computations are correct but we do think that the new E Street Building, with the aid of an additional 2 years' use, would have increased the petitioner's net income during the base period, and, consequently, we are convinced, on the record, that its average base period net income does not reflect the normal base period earnings of petitioner with the new addition. It is clear to us that the new space would enable the management to better display the merchandise, to control the traffic of customers through the store with greater efficiency, and to permit the introduction of more effective merchandising techniques. However, we are not persuaded that the $4,000,000 additional sales figure claimed by the petitioner is realistic. For example, it was brought out at the trial that some of the departments, with added space after the new addition, did not show the increases in sales performance which the petitioner claims would occur uniformly throughout the store. In fact, some of the departments showed a drop in performance. Also, the evidence introduced shows that some of the increased sales during the base period, which the petitioner seeks to attribute entirely to the new addition, was due to the increasingly favorable economic conditions in the Washington area which were shared by all stores alike.

In reconstructing the base period performance we must limit ourselves to the increases in net income resulting from the new addition. We do not agree with the estimated earnings which petitioner attributes to the increased sales which would result from the new addition. Petitioner is unrealistic in its estimates of the increased expenses which would be attributable to the new addition. For example, its estimates of the increased depreciation and repairs expenses which would result from the new addition, especially in the case of the repairs item, bear a marked discrepancy with the expenditures actually incurred in connection with the new addition when it was placed in operation. In addition, we do not agree with the petitioner's argument that the new addition would not cause any appreciable addition in repairs expenses. Such an assertion is contrary to ordinary experience and, moreover, it is refuted by the record. Also, while we agree with the petitioner that expenses can be fixed or variable, and that the fixed expenses would not increase appreciably along with the projected increase in sales resulting from the new addition, we think that the petitioner's argument that its variable expenses are merely

approximately 12 per cent of sales is much too low. This is shown by evidence in the record which charts the petitioner's performance over the years.

With these considerations in mind, and after a careful examination of the record, we have determined to the best of our ability that the petitioner's net income due to the new addition would have increased in the amount of $300,000 by the end of the base period.

Petitioner, in addition, claims relief due to a difference during the base period in the ratio of its nonborrowed capital to its total capital. Sec. 722 (b) (4). This is a separate and distinct factor for relief, which must be considered separately from any other claims arising under this relief section. *Jefferson Amusement Co.*, 18 T. C. 44. All the pertinent information arising under this particular point has been stipulated. Petitioner contends that it is entitled to relief on account of this factor in the amount of $29,601.56. Respondent, in his reply brief, "raises no question that this interest reduction was not substantial or that same did not constitute a change in character." However, the respondent has put forth several arguments as to whether or not the petitioner, under the facts of this case, is entitled to relief under this claim. We have examined these contentions and have found them to be without merit. We hold, therefore, that the petitioner's computations are correct and that it is entitled to additional relief in the amount of $29,601.56 for each of its excess profits tax years 1941 through 1946.

We hold that the petitioner's constructive average base period net income for each of the years 1943 through 1946 is $2,422,050. There is a different amount for the years 1941 and 1942 under the variable credit rule which is applicable here because the changes were not completed and the full level attributable to such changes was not realized prior to the end of those years. For the fiscal year 1941 the only added relief is that due to the difference in the ratio of its nonborrowed capital to its total capital. For the year 1942, in addition to the added relief in the amount of $29,601.56, the petitioner is entitled to only a portion of the $300,000, since the new addition was only put into effective operation in the latter part of the year 1941. Petitioner, in arriving at this portion, contends that 59 per cent is a just and reasonable allocation. We disagree, and after an examination of the relevant evidence, we think that 45 per cent, for purposes of the variable credit rule, would be a more reasonable figure to be used.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*