COPCO STEEL AND ENGINEERING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31716. Filed December 31, 1958.

*J. Marvin Haynes, Esq., N. Barr Miller, Esq.,* and *Oscar L. Tyree, Esq.,* for the petitioner.

*Irene F. Scott, Esq.,* and *John K. Barry, Esq.,* for the respondent.

### OPINION.

ARUNDELL, *Judge:* The petitioner duly filed applications for excess profits tax relief under section 722 of the Internal Revenue Code of 1939, and related claims for refund of excess profits taxes paid for the calendar years 1940 to 1945, both inclusive.

Respondent determined that under section 722 (b) (4) petitioner is qualified for relief by reason of base period changes in the character of its business but denied petitioner's further claims for relief based upon alleged commitments for increases in capacity for production or operation consummated after December 31, 1939. The constructive average base period net income determined by respondent resulted in a partial allowance of relief for 1940 and 1941 and a disallowance of any relief for the years 1942 through 1945. At the hearing, respondent conceded that in such determination he erred in failing to allow an unused excess profits credit carryover in the amount of $4,301.23 from 1940 to 1941.

The questions presented for decision are whether, in addition to the agreed qualifying factor of base period changes, petitioner is also qualified for relief under section 722 (b) (4) by reason of alleged changes in capacity for production or operation consummated after December 31, 1939, as a result of a course of action to which petitioner was theretofore committed, and petitioner's business did not reach by the end of the base period the earning level which it would have reached had such alleged committed-for changes been made 2 years earlier and, further, whether petitioner has established a fair and just amount representing normal earnings to be used as a constructive average base period net income in excess of the amount determined by respondent.

The evidence in this case was presented before a commissioner of this Court. The commissioner made a report of his findings of fact, which report was served upon the parties on June 18, 1958. The petitioner does not object to any specific finding of fact as made in the commissioner's report. However, it should be noted here that petitioner is in error in suggesting on reply brief that the commissioner's report makes any ultimate finding of fact that petitioner was committed prior to December 31, 1939, to make certain alleged changes

in capacity subsequent to that date. This matter will be more particularly discussed later in this report. The respondent has filed certain objections to the commissioner's report of findings of fact. Some of these objections, we think, are without merit and others become immaterial in the light of our conclusions herein, and therefore these objections by respondent are denied. The additional findings requested by the respondent and the ultimate conclusions requested by both parties will be set out herein to the extent they are granted.

The Court adopts the commissioner's report of findings of fact, which sets forth in detail the essential facts established by the voluminous record in this case. For the purpose of this opinion, there will be set forth herein a résumé of the facts involved and, in addition, such ultimate conclusions as are deemed appropriate in the disposition of the case.

Petitioner, a family-controlled corporation, was organized under the laws of Michigan in September 1932, with an authorized capital stock of $5,000 of which $1,050 was paid in at that time. Robert Carnick and his two sons, Lyle and Arthur, became petitioner's first officers and directors. Robert Carnick had extensive prior experience in the business of steel warehousing and steel fabricating, and it was intended that petitioner would ultimately establish and engage in the business of steel warehousing with integrated fabricating and manufacturing departments.

Petitioner initially engaged in the business of buying, reconditioning, and selling used pipe. Petitioner gradually expanded its operations which, by 1936, included the purchase and resale of limited quantities of steel materials and prefabricated products used in residential construction. Such materials and products included used structural steel, certain types of prime mill steel, prefabricated steel products, such as ash dumps, chimney cleanout doors, etc., and standard sizes of steel basement window sash. Also, petitioner performed limited fabrication work on structural steel by shearing, punching, and drilling such steel to customers' specifications.

Petitioner initially occupied rented premises on Grand River Avenue, Detroit, which formerly had been used for a lumberyard. From 1932 to 1935 petitioner occupied part of those premises consisting of one-half acre of ground with a railroad siding and one small frame building. In 1935 petitioner rented additional property at the same location, providing it with a total of 3¾ acres of ground and 21,200 square feet of covered floor space in 4 wooden buildings, including a lumber shed acquired for storage of warehouse steel. During 1936 petitioner renovated the lumber shed by putting in a concrete floor, substituting steel columns for the wooden posts supporting the roof, and the installation therein of an overhead crane and related facilities for handling warehouse steel. In 1937 petitioner purchased the

rented Grand River Avenue premises as a permanent place of business because it was a good location and contained vacant ground area for future expansion. This purchase was financed mainly by the issuance of long-term notes.

In February 1936 petitioner employed Robert D. Duffield, a structural designer and engineer. Throughout the base period years, Duffield superintended plant operations, supervised experimental development work on various steel products, and planned and laid out the production lines for the manufacture of the items petitioner decided to produce. In addition, Duffield supervised the planning and construction of improvements made to petitioner's buildings and plant facilities during the base period. In 1937 he also started preparing a long-range program for the future construction of new buildings and expanded facilities on the Grand River Avenue premises purchased in that year. The planning work on such program continued until detailed plans and drawings were essentially completed by early 1939 and designated petitioner's master plan. Those plans were destroyed in a fire which occurred in May 1940 but were recreated in connection with the filing of applications for relief, and those reconstructed plans were introduced in evidence herein as a part of Duffield's testimony.

During 1938 petitioner commenced the manufacture and sale of steel products for use in residential building, including steel basement window sash of its own design, joist angles and hangers, ash dumps, and chimney cleanout doors. In that year petitioner also commenced a limited amount of fabrication of steel parts on a jobbing basis for other manufacturers. By the end of 1938 petitioner was using 14,800 square feet of covered floor space in its old wooden buildings for steel warehousing operations and 6,400 square feet for manufacturing operations. During 1938 petitioner installed an overhead crane to service 9,600 square feet of open yard space for use in warehousing steel and the fabrication of structural steel.

At various times during 1939 petitioner commenced the manufacture and sale of additional steel products for use in residential building, including coal chute doors, package receivers, clothes chute doors, and medicine cabinets. During 1938 petitioner began to expand its sales of manufactured steel products beyond the Detroit area and during 1939 it made sales of such products in amounts ranging from approximately $106 to $14,778, totaling approximately $29,447, in 11 different States other than Michigan.

During 1939 petitioner purchased an additional 10,100 square feet of land adjacent to its property for use in connection with its contemplated future expansion. During 1939 petitioner constructed new buildings containing 1,500 square feet of floor space completed in February, and 8,100 square feet of floor space completed in Novem-

ber. Such construction was principally for manufacturing operations but 3,200 square feet thereof was designed for industrial fabrication. Petitioner increased its floorspace capacity for manufacturing and industrial fabrication from 6,400 square feet at the beginning of 1939 to 16,000 square feet at the end of 1939.

Petitioner's covered floorspace and crane-serviced yard space for its various operations totaled 30,800 and 40,400 square feet at the end of 1938 and 1939, respectively The necessary additional machinery and equipment were acquired by petitioner as its plant facilities were improved and enlarged and the character of its operations was expanded.

Prior to the end of 1939, petitioner completed designs, working models, and estimated production line requirements for a line of steel casement and industrial windows. At the end of 1939 the manufacture of such products remained in the planning stage and wholly dependent upon petitioner's future construction of additional factory space contemplated in its long-range program.

During the base period years, petitioner's renovated lumber shed and other facilities for storing and handling warehouse steel imposed limitations on its warehousing operations. Petitioner carried only a limited number of sizes, gauges, and shapes of both prime and secondary mill steel. Its principal items of prime steel consisted of structural beams, angles and channels, and hot rolled bar-size angles, flats, bands and rounds. Its principal items of secondary steel were hot rolled sheets and plates. By the fall of 1939, petitioner's warehouse had become crowded and efficiency of operation was reduced by excessive handling costs in shifting steel to fill particular orders. Petitioner accepted orders for numerous items of steel which it did not stock in order to acquire and hold desirable customers. Petitioner filled such orders through purchases from other local warehouses which resulted in little or no profit and sometimes a loss. Throughout the base period years and because of competition with other Detroit warehouses, petitioner followed the practice of making various price concessions on items of warehouse steel in order to obtain and hold new customers.

In December 1939, petitioner completed negotiations for the possession of a building at 6400 Wight Street, Detroit, which contained 20,700 square feet of space, two 10-ton overhead cranes, and facilities for pickling steel. The building had been previously occupied and used as a steel warehouse and for pickling, which is a process of immersing steel in a sulfuric acid bath to remove scale and rust. Petitioner decided to undertake steel pickling as a complementary operation to its steel warehouse business. On behalf of petitioner, a lease for the Wight Street premises for a term of 11 months commencing on January 1, 1940, was executed in the name of Boyd

Carnick as lessee on January 2, 1940, and a bill of sale for the pickling equipment was issued to him on January 6, 1940. Boyd Carnick was a son of Robert Carnick and at that time an officer of the petitioner. In January 1940 petitioner transferred some steel from its Grand River Avenue plant and commenced to use the 15,000 square feet of space in the Wight Street building available for warehousing steel, and sales from that facility totaled $209,182.44 for 1940. In January 1940, and on behalf of petitioner, Boyd Carnick registered in Wayne County, Michigan, to do business under the assumed name of Lake Erie Metal Pickling Company and commenced a steel-pickling operation in January 1940, using 5,700 square feet of space and the pickling equipment in the Wight Street building. The pickling operation showed a profit of $1,147.72 for the year 1940.

In regard to the leasing of the Wight Street premises in 1940, we find as an ultimate conclusion that petitioner consummated a change in capacity for production or operation as a result of a course of action to which petitioner was committed prior to the end of 1939, within the meaning of section 722 (b) (4). Petitioner thereby increased its capacity for operation of its steel warehouse business by 15,000 square feet of covered floorspace in addition to the 14,800 square feet of floorspace then used in the renovated lumber shed for steel warehousing at Grand River Avenue and, further, increased its capacity for operation by the additional 5,700 square feet of covered floorspace in the Wight Street building used for pickling steel as a service in conjunction with warehousing steel. The petitioner's steel warehouse business did not reach, by the end of the base period, the earning level which it would have reached had such committed-for change in capacity for production or operation been made 2 years earlier. The respondent erred in denying petitioner relief based upon such committed-for change in capacity for production or operation.

We have heretofore discussed petitioner's actual base period changes in the character of its business and, also, its committed-for change in capacity for production or operation by acquiring the Wight Street facilities. The leasing of the Wight Street property was not embraced in the plans outlined in petitioner's long-range program for proposed expansion of its facilities. At the time of acquisition, petitioner planned to use the Wight Street premises together with its Grand River Avenue steel warehouse facilities.

The petitioner's so-called master plan was in process of being prepared from 1937 until the plans and drawings were essentially completed by early 1939. The report of the commissioner of this Court, served upon the parties, sets forth in detail the facts of record as to the proposed plans for contemplated future construction, at the Grand River Avenue location, to provide petitioner with a plant capacity it expected ultimately to operate in a greatly expanded business of

steel warehousing, manufacturing, and fabricating. Briefly, the long-range program proposed new construction spread over a 4-year period, 1939–1942, the ultimate completion of which would provide petitioner with a total of 181,850 square feet of operating yard and building space at an estimated cost of approximately $1,195,000 for land, buildings, machinery, etc. In addition, the program proposed a complete steel warehouse inventory at an estimated cost of approximately $812,719. These estimates were based on 1939 costs.

The record establishes and the commissioner's report in this case finds that in 1939 the petitioner had a detailed plan or program for *contemplated* future construction. The commissioner's report further finds the facts, established by the record, as to petitioner's various business activities at the times material herein, including the petitioner's actual changes in capacity for production or operation prior and subsequent to December 31, 1939. The commissioner's report does not, as erroneously suggested on brief by petitioner, make any finding that petitioner's plant facilities acquired after December 31, 1939, were the result of a course of action theretofore taken which committed petitioner to undertake a carrying out of its long-range program either partially or in its entirety. The question of whether or not there was a commitment within the meaning of section 722 (b) (4) is an ultimate conclusion to be reached upon a consideration of all the surrounding facts and circumstances in the instant case.

At the end of 1939, petitioner's so-called master plan constituted a long-range program for future construction of greatly expanded plant facilities to meet estimated requirements of anticipated or hoped-for future growth of petitioner's business. The several proposed projects were more or less independent of each other. The program was flexible and subject to modification to fit changing conditions and remained in the planning stage as to whether, and if so when, any part thereof would be actually carried out. As of December 31, 1939, the matter of petitioner's undertaking of actual construction work, at any future time, was wholly dependent on several factors, including the growth of petitioner's own business, the general business conditions, the petitioner's ability to earn profits on the ventures theretofore undertaken and, also, petitioner's ability to finance new construction at the time of the undertaking. The facts herein show that throughout the years prior and during the base period, petitioner had ever-present financial problems due in part to a constant low level of earnings. Petitioner's net sales (in round figures) amounted to $311,873 for 1936, $519,398 for 1937, $495,020 for 1938, and $860,167 for 1939, and its net profits (or loss) for the same years (in round figures) amounted to $5,204 for 1936, $5,223 for 1937, ($3,407) for 1938, and $28,261 for 1939. Petitioner's profit ratio of net income to net sales was only 3.28 per cent for 1939.

At the end of 1939 the petitioner had (in round figures) $305,879 assets, $221,828 liabilities, $56,400 capital stock, and $27,651 earned surplus. On the facts of record, it is clear that as of December 31, 1939, the petitioner did not have its own financial means, in capital or surplus, to undertake any new construction and that if such construction were to be undertaken it would have to be financed largely by arranging for some form of credit as petitioner had done in previous years.

At the end of 1939, petitioner had a plan or program which outlined *contemplated* future construction but at that time it had taken no definite course of action toward arranging for financing or contracting or any other definitive step whereby it was committed actually to undertake any new construction work during 1940 or the subsequent years. The petitioner's 1939 purchase of an additional 10,100 square feet of land adjacent to its Grand River Avenue property was not so inextricably intertwined with the proposed construction program as to constitute a commitment to carry out such program. The petitioner's construction of a total of 9,600 square feet of building floorspace during 1939 was a departure from the so-called master plan which proposed only 4,400 square feet of construction in 1939, but in any event such new construction constituted a completed base period change which in no way committed petitioner to undertake additional future construction work.

In May 1940, petitioner's buildings and the equipment therein at the Grand River Avenue plant were almost completely destroyed by fire. The insurance proceeds paid to petitioner amounted to $108,510.83 of which petitioner spent $91,093.68 in constructing 2 new buildings completed in 1940 and the balance in purchasing machinery and rectifying damaged materials. The character of such new construction was not a fundamental departure from the proposal in the so-called master plan for erection of similar buildings in 1940. However, the 1940 construction was not in pursuance of any course of action to which petitioner was committed prior to December 31, 1939. Instead, such construction was the direct result of the unforeseen events of a fire and the availability of insurance proceeds which enabled petitioner to construct improved facilities as a replacement of destroyed facilities. Petitioner's 1940 replacement of facilities at its Grand River Avenue property was essential to its continued operation at that location rather than a previously committed-for change in capacity for production or operation.

Petitioner's yard and building operating space remained substantially the same throughout 1941 and during most of 1942. Petitioner sought and obtained some defense work in 1941 and in January 1942 it was awarded a Navy contract for the fabrication of gun shields. On March 15, 1942, petitioner discontinued the manufacture

of steel products for the building industry and devoted its manufacturing and fabricating facilities primarily to the production of gun shields until 1945. Petitioner continued to warehouse and pickle steel throughout the war years. In September 1942, petitioner purchased a building on Central Avenue, Detroit, which was used for warehousing and pickling steel in place of the Wight Street property which at or about the same time was relinquished. During 1943 petitioner acquired additional operating space by construction and by lease, and at the end of that year petitioner had yard and building operating space totaling in excess of 184,000 square feet. The petitioner's 1942 and 1943 additions to its plant facilities were not in accordance with the so-called master plan and, further, were not in pursuance of any course of action to which petitioner was committed prior to January 1, 1940. The Central Avenue acquisition by purchase was merely in substitution for the leased Wight Street property. The 1943 additions were the direct result of and for use in petitioner's defense production efforts during the war years.

At the end of the war, petitioner retained its then-existing plant facilities and continued its steel warehousing operations and resumed its production of builders' manufactured steel products and industrial fabrication work. Also, petitioner undertook to enter into the manufacture of steel industrial and casement windows.

Petitioner contends that prior to January 1, 1940, it was committed to a course of action of carrying out the entire expansion program proposed in the so-called master plan to increase its capacity for production or operation and that such commitment was substantially consummated in square feet of operating space by the end of 1943, within the meaning of section 722 (b) (4). Petitioner further contends that it is entitled to a reconstruction of average base period earnings based upon the total expanded capacity proposed by its so-called master plan, for the operation of a completely stocked steel warehouse, for expanded steel fabrication work for structural and industrial purposes, and for expanded manufacture of building steel products including the ones in production during the base period and, also, steel casement and industrial windows.

In our opinion, the facts herein do not establish that, prior to January 1, 1940, petitioner was committed to undertake the entire construction program (or any part thereof) proposed in the so-called master plan. There is no doubt that prior to January 1, 1940, petitioner had great hopes and expectations of establishing a greatly expanded business enterprise and in connection therewith had developed a plan for proposed construction over a period of years of new and expanded plant facilities designed for certain projected uses in the anticipated future growth of the business. However, the mere existence of a plan or program for *contemplated* future expansion

does not of itself constitute a commitment within the meaning of section 722 (b) (4) and Regulations 112, section 35.722–3 (d),[1] for the reason that, prior to January 1, 1940, petitioner did not take any course of action or make any definitive change in position which unequivocally established a commitment actually to undertake the contemplated new construction at any particular time, if ever. In short, at the crucial date of December 31, 1939, the so-called master plan was still in the planning stage in regard to the eventual carrying out of any of the various phases thereof. Cf. *Lansburgh & Bro.*, 30 T. C. 1114; *Peter J. Schweitzer, Inc.*, 30 T. C. 42; *Royal Cotton Mill Co.*, 29 T. C. 761; and *Central Produce Co.*, 18 T. C. 267.

In *Robinson Terminal Warehouse Corporation*, 19 T. C. 1185, 1192, in which it was held that where a taxpayer acquired waterfront property and built one warehouse there was no commitment to build a second warehouse on the same property, the Court cited with approval a provision in the Bulletin on Section 722, part V, par. (C), p. 58, as follows:

The change in position must unequivocally establish the intent to make the change within a reasonably definite period of time. Its significance should not be open to doubt. Thus, the mere purchase of land is not, standing alone, a change of position which points exclusively to the acquisition of new facilities, or pledges the taxpayer to any specific use of the land.

In *Lansburgh & Bro., supra*, the taxpayer had, prior to January 1, 1940, a broad general program for proposed improvement and expansion of plant facilities but prior to that date it made no decision to proceed and made no commitments whatever to carry out certain proposed construction. It was not until sometime in 1940 or early 1941 that the taxpayer took definite steps toward the financing and construction of the building expansion completed in 1941. The Court held that the taxpayer's 1941 changes in capacity for production or operation were not the result of a course of action to which the taxpayer was committed prior to January 1, 1940.

In *Peter J. Schweitzer, supra*, the Court sustained the taxpayer's claimed commitment for a new building and certain equipment and also for one cigarette paper machine ordered in November 1939 and installed in July 1940 but denied application of the commitment rule as to a second paper machine, saying in part, as follows:

However we cannot agree that petitioner was committed, prior to January 1, 1940, to increase its capacity for production by the addition of a second 125-

---

[1] Regs. 112, Sec. 35.722–3 (d). *Commencement or change in character of business.—*
    *        *        *        *        *        *        *

The taxpayer must also establish by competent evidence that it was committed prior to January 1, 1940, to a course of action leading to such change. Such a commitment may be proved by a contract for the construction, purchase, or other acquisition of facilities resulting in such change, by the expenditure of money in the commencement of the desired change, by the institution of legal action looking toward such change, or by any other change in position unequivocally establishing the intent to make the change and commitment to a course of action leading to such change. * * *

inch cigarette paper machine, since we think petitioner has failed to show that it made a change in position which unequivocally established a commitment to increase its capacity for production by adding such a machine and commitment to a course of action leading to such change. See Regs. 112, sec. 35.722–3 (d).

Petitioner has shown nothing more than that it had a plan for eventually adding a second cigarette paper machine some day in the future, if, and only if, the demand for petitioner's cigarette paper required such addition. We hold that petitioner has failed to show that it was committed to increase its capacity for production or operation by the addition of a second 125-inch cigarette machine, within the meaning of section 722 (b) (4).

Based upon all the facts and circumstances disclosed in the record herein, we conclude and so hold (exclusive of the above-mentioned Wight Street premises) that at the end of 1939 the petitioner was not committed to any course of action to increase its capacity for production or operation by the expansions which were made subsequent to December 31, 1939.

The instant case is distinguishable on its facts from the cases relied upon by petitioner and also several other similar commitment cases in that in each of those cases the taxpayer established that it had a plan coupled with some definitive course of action taken on the strength of such plan, prior to January 1, 1940, as the actual commencement of the desired change in capacity for production or operation, consummated after December 31, 1939. In *Studio Theatre Inc.*, 18 T. C. 548, the taxpayer, prior to January 1, 1940, leased an adjoining building for the specific purpose of increasing seating capacity and it was held that the taxpayer was committed to the change in seating capacity consummated after December 31, 1939. In *Springfield Tablet Manufacturing Co.*, 22 T. C. 35, the taxpayer authorized the purchase of several machines to make a new product and actually acquired part of the machinery prior to January 1, 1940, and it was held that there was a commitment for additional machinery acquired in February 1940. In *Crowell-Collier Publishing Co.*, 25 T. C. 1268, the taxpayer planned a schedule of installations of new printing presses, actually installed 6 presses, and trained operators for additional presses, all prior to January 1, 1940, and it was held that the taxpayer was committed for 2 additional printing presses installed in 1941. In *Hydraulic Press Manufacturing Co.*, 27 T. C. 278, the taxpayer decided to build a new plant, issued additional capital stock to finance it, and contracted for the design of the plant, all prior to January 1, 1940, and it was held that the taxpayer was committed for the new plant completed in 1940. In *Hecht Co.*, 31 T. C. 374, the taxpayer definitely decided to construct a new building for additional selling space. The taxpayer had the funds available to finance the new construction; it engaged a firm of architects and engineers; it had the plans for the new store building; it purchased a lot necessary to the closing of an alley; and it engaged a law firm to obtain

approval of the District of Columbia for certain alley changes necessary for the planned construction, all prior to January 1, 1940. The Court held that such activities, taken together, constituted a course of action as a result of which the taxpayer was committed prior to January 1, 1940, for the new building actually completed in 1941.

The parties are agreed that petitioner had base period changes as a qualifying factor for relief. The record herein shows that beginning in 1935 and continuing throughout the base period the petitioner made substantial changes in the character of its business, including a difference in products and in capacity for production or operation. In addition, petitioner has established a further qualifying factor of a commitment prior to January 1, 1940, to lease the Wight Street property which was consummated on January 2, 1940, and which doubled petitioner's covered floorspace capacity for warehousing steel and provided new capacity and facilities for pickling steel as a service in conjunction with its warehousing operations. The petitioner's average base period net income is an inadequate standard of normal earnings and does not reflect the normal operation of the business for the entire base period. The petitioner's business did not reach by the end of the base period the level of earnings it would have reached had it changed the character of its business 2 years before it did so. The petitioner's committed-for change in capacity is deemed to be a change on December 31, 1939. The petitioner's excess profits tax for the years 1940 to 1945, inclusive, computed without the benefit of section 722, results in an excessive and discriminatory tax.

Petitioner's excess profits credit as finally determined by respondent, prior to application of section 722, was $12,518.95 for 1940, and $16,327.38 for 1941 under the income method for those 2 years, and $27,169.64 for 1942, $49,918.84 for 1943, $72,570.32 for 1944, and $85,110.39 for 1945 under the invested capital method for the latter 4 years.

After application of section 722, respondent determined a constructive average base period net income of $30,063 for 1940 (after application of the variable credit rule and the deduction for income tax, as provided by section 711 (b) (1) (A) of the 1939 Code), and $45,606 for the years 1941 through 1945.

We have given full consideration to all the facts of record. In applying the 2-year push-back rule, we have given consideration to petitioner's own experience in expansion of its business and growth of its sales and also its own level of earnings. We have used our best judgment in reconstructing a reasonable increased net sales figure and level of earnings which would have been reached as of December 31, 1939, in the light of petitioner's qualifying factors, under base period circumstances, and including in petitioner's manufacturing

operations only those types of products being produced at the end of 1939. We have used the index figure of 91.2 as appropriate for the purpose of backcasting. In the exercise of our best judgment, we have determined that a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of computing petitioner's excess profits credit is $87,000 for the taxable year 1940 and $105,000 for the taxable years 1941 to 1945, inclusive. The amount determined for 1940 results from the application of the variable credit rule which is appropriate in this case. Although the qualifying changes in capacity were complete at the beginning of the year 1940, the full level of normal earnings attributable to such changes was not reached until the end of that year. A further adjustment for income taxes will be made under Rule 50 for the taxable year 1940.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*