CORN PRODUCTS COMPANY (FORMERLY CORN PRODUCTS REFINING COMPANY), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 31611, 79743. Filed September 13, 1961.

*Jay O. Kramer, Esq.*, and *Gilbert I. Falk, CPA*, for the petitioner.
*George J. LeBlanc, Esq.*, for the respondent.

TIETJENS, *Judge:* These proceedings involve respondent's disallowance of claims for excess profits tax relief under section 722, I.R.C. 1939, for the years 1942 and 1943. Petitioner seeks relief under section 722(b)(2) because of the severe drought in the Corn Belt in 1936 and the resulting abnormally high prices which it had to pay for corn in 1936 and 1937; and under section 722(b)(4) because of commitments, prior to the close of its base period, to changes in the character

of its business by installing new equipment in some of its plants and by closing down one of the plants which was operating at a loss and transferring its operations to other plants.

If it prevails in its claim for relief under section 722, petitioner claims the carryback of unused excess profits credits from 1944 to 1942 and from 1945 to 1943.

The evidence in this case was presented before a commissioner of this Court. The report of his findings of fact was served on the parties. In general, the commissioner has taken no objection to such findings, but the petitioner seeks two additional findings, to which we agree it is entitled. They are incorporated in findings appearing hereafter.

### FINDINGS OF FACT.

All of the stipulated facts are found as set out in the written stipulation and exhibits attached thereto.

Petitioner is a New Jersey corporation with its principal office located in New York, New York. Its income and excess profits tax returns for the years involved were filed with the collector of internal revenue for the second district of New York.

Petitioner is engaged in the manufacture and sale of corn products. It is a member of the wet-milling industry and is the largest producer in the industry. In the wet-milling industry the corn kernels are kept suspended in water throughout most of the milling processes. The wet-milling and dry-milling industries together utilize more than four-fifths of all of the corn entering manufacturing industries and more than two-fifths of all corn sold from domestic farms. The chief products of the wet-milling industry are starch and its derivatives, corn syrup and sugar. The products of the dry-milling industry are meal, grits, breakfast foods, and other such products.

The manufacture of commercial starch from corn was begun in the United States about 1840. Soon thereafter corn became the chief source of domestic starch. Previously, starch had been manufactured from potatoes and wheat.

During the base period years, 1936–1939, petitioner had operating plants in Argo and Pekin, Illinois, Kansas City, Missouri, and Edgewater, New Jersey. These plants were fully equipped for manufacturing and marketing petitioner's corn products. They had daily grinding capacities, respectively, of 80,000 bushels, 49,000 bushels, 18,700 bushels, and 30,000 bushels of corn. Corn grinding was suspended at the Edgewater plant in 1927. Thereafter and during the base period years, that plant was used principally for finishing products partially processed at the other plants. Petitioner also owned, or had an interest in, foreign plants located in 13 foreign countries, and also owned a number of domestic subsidiaries.

Petitioner's chief marketable products are starch, syrup, and sugar. Cornstarch, as such, is used principally for sizing paper and textiles. Only about 25 percent of the total production is used for food. Corn syrup and sugar are used principally in confections, canned goods, and other manufactured food products. About 75 percent of petitioner's production of starch, sugar, and syrup is sold in bulk to industrial users, such as paper and textile manufacturers, bakers, brewers, canners, confectioners, and soft drink bottlers. The remaining 25 percent is sold as packaged goods to wholesalers and jobbers for distribution to retailers. During the base period years petitioner's bulk sales of starch, syrup, and sugar accounted for about 50 percent of its total sales and its sales of packaged goods and byproducts about 25 percent each. Petitioner's major byproducts were corn oil and stock feeds.

The wet milling of corn involves a number of highly technical operations, both mechanical and chemical. The corn kernels are first cleaned and soaked in a warm solution of sulphur dioxide for softening. They are then run through degerminating mills and separators which separate the oil-bearing kernels from other component parts. The oil is then extracted from the germs and further treated, so that it becomes clear, edible corn oil. The remaining components, starch, gluten, and hulls, still in solution, are finely ground and the hulls removed by various screening and washing devices, leaving only the starch and gluten. This mixture is then pumped to high-speed centrifugal machines where the lighter gluten is separated from the heavier starch by centrifugal force. The starch is further treated by washing and filtering and is then ready either for drying and packaging or for conversion into syrup or sugar. The gluten, after further treatment, goes to the feed house, along with the husks, and becomes a high protein ingredient of corn gluten feed. A portion of the starch is marketed as such in various forms for particular uses and a somewhat larger portion is converted into syrup and sugar. Also, some of the starch is converted by treatment with chemicals and heat into dextrine. In this form it is a fine, white to light brown powder with varying characteristics suitable for its intended uses.

In making corn syrup an acidified solution of cornstarch is heated in large cylindrical pressure cookers called converters to a certain temperature and after being treated with soda ash is filtered and evaporated to the desired consistency. The syrup is then transparent, nearly colorless, and only slightly sweet. Corn sugar is made by the same method as syrup except that more acid is used and the conversion time is extended resulting in the removal of more of the hydrol (molasses) and permitting more complete crystallization.

Under ordinary market conditions a bushel of corn weighs 56 pounds. When milled by the wet-milling process it yields approximately 30.8 pounds (55 percent) of starch, 14.5 pounds (26 percent) of

feed, and 1.7 pounds (3 percent) of oil. The average moisture content is about 9 pounds (16 percent) per bushel.

Corn sugar, in the first stage of processing, is known as dextrose hydrate. In a moisture-free form it is known as anhydrous dextrose. Petitioner marketed its dextrose under the trade name of Cerelose. About 90 percent of its sugar production during the base period was marketed in this form. Petitioner produced about 80 percent of the dextrose manufactured in the United States. It owned patents on the manufacturing process which it leased to other manufacturers.

Petitioner's operating plants at Argo, Pekin, and Kansas City, all had complete facilities for manufacturing starch, sugar, and other corn products, as well as facilities for manufacturing shipping cartons and cans and for printing labels for packaged goods.

Among petitioner's wholly owned domestic subsidiaries were Corn Products Sales Company, a New Jersey corporation, organized in 1921, and Corn Products Sales Company, a Massachusetts trust, organized in 1937. These subsidiaries served as sales agents and jobbers for petitioner's products. Petitioner sold its products to them at the same price as to other customers. Petitioner made other sales directly to foreign purchasers and in certain States to domestic purchasers.

The price of dextrose is geared directly to the price of refined cane or beet sugar. The usual delivered price of dextrose at any point is the delivered price of cane or beet sugar at that point, less a differential of 17 to 20 percent. The "Basis Prices," as they are known in the trade, for dextrose are the cane sugar prices at the key sugar-refining points, such as Boston, New York, Philadelphia, New Orleans, Savannah, and San Francisco. Sugar prices at the basing points are fairly uniform. The principal sources of raw sugar during the base period years were Cuba, Puerto Rico, and the Philippines. A small amount of domestic cane sugar was produced in the southeastern States. Beet sugar was produced in a few western and midwestern States.

The price of corn syrup is geared to the price of corn rather than to the price of cane sugar, except that the price of cane sugar sets a ceiling on the price of corn syrup. Those products can be used interchangeably by most industrial users. For syrup-pricing purposes, petitioner determined the cost of its corn by subtracting from the actual purchase price the proceeds from the sale of byproducts, such as feeds and oil.

The pricing of packaged goods, such as Karo syrup, Mazola oil, Argo gloss, and Linit laundry starch, was based on a division of the United States into eight geographic zones in each of which prices were fixed for sales within that zone.

Petitioner's general sales policy, as to Cerelose, has been to contract for shipments within 30 days at a specified price but with the understanding that the final price would be either such contract price or the

actual market price at the date of delivery, whichever was lower. There was an exception to that policy when petitioner in January 1940, by telegram, invited its customers to place orders for Cerelose on or before January 20, 1940, to be delivered as late as June 30, 1940, either at the January 15 price or the date of delivery price, whichever was lower. The purchasers were given the right to cancel all or any part of the orders. In response to that offer petitioner's sales of Cerelose amounted to approximately 2 million bags (100 pounds each).

There were further exceptions to petitioner's general sales policy when it entered into contracts with Huron Milling Company in 1927, and with Keever Starch Company in 1932 for the delivery of large shipments of starch over a period of 15 years at prices dependent upon several factors, including the cost of corn and labor. The shipments of starch under these contracts and the quantities of corn utilized in manufacturing the starch, were as follows:

| Year | Pounds of starch shipped | Approximate number of bushels of corn required for this business |
|------|---|---|
| 1936 | 51, 170, 589 | 1, 457, 839 |
| 1937 | 47, 856, 951 | 1, 372, 284 |
| 1938 | 44, 266, 686 | 1, 305, 785 |
| 1939 | 48, 624, 920 | 1, 451, 490 |

Some of the pricing and trade practices followed by petitioner during the base period were found to be unlawful and were restricted by order of the Federal Trade Commission and the courts.

It was petitioner's practice from time to time to offer Cerelose to its customers for a short period of time at reduced prices from 10 to 25 cents per 100-pound bag to reduce its inventories or to meet competition in a certain locality. The reduction usually produced the desired result.

At the beginning of the base period there was in progress a wide expansion of the dextrose market. This was due, largely, to an intensive advertising campaign put on by the corn products manufacturers for extension of the uses of dextrose, particularly in the large commercial fields.

The wet-milling industry is highly competitive, both within its own and with other industries. The competitive products of corn sweeteners are cane and beet sweeteners. They usually sell at a price higher than the corn products. Corn and cane sweeteners can be used interchangeably for most commercial purposes. The chief competitive products of cornstarch are imported tapioca, sago, and arrowroot starches. These starches are imported duty-free. They usually sell at prices slightly below domestic cornstarch prices. There was a large increase in the imports of starches in 1935 and 1937, due to

the short domestic corn crops in 1934 and 1936. The consumption of domestic and imported starches in the United States during the 1935–1939 period, in millions of pounds, was as follows:

| Year | Domestic starches | | Imported starches | | Total consumption |
|---|---|---|---|---|---|
| | Corn | Potato | Tapioca and Sago | Other | |
| 1935 | 592.1 | 33.8 | 226.9 | 13.4 | 866.2 |
| 1936 | 801.0 | 23.5 | 305.9 | 18.2 | 1,148.6 |
| 1937 | 684.8 | 16.7 | 416.4 | 17.2 | 1,135.1 |
| 1938 | 726.5 | 21.1 | 242.7 | 13.2 | 1,003.5 |
| 1939 | 815.1 | 18.9 | 405.6 | 20.4 | 1,260.0 |

Although the quoted prices of Cerelose and cane sugar fluctuated irregularly and independently from time to time, they tended to equalize after each change, with a differential in favor of cane sugar of approximately $1 per 100-pound bag.

Petitioner usually purchased corn in the spot market in "off the floor" negotiations with large grain houses. Spot market prices were determined, largely, on the basis of current supply and crop estimates. There were severe droughts over most of the midwest Corn Belt in 1934 and 1936 which greatly reduced the supply of corn and caused substantial price increases.

The following table shows the yield per acre and total corn production in the United States over the 1922–1939 period:

| Year | Yield per acre | Total production | Year | Yield per acre | Total production |
|---|---|---|---|---|---|
| | (Bushels) | (Million bushels) | | (Bushels) | (Million bushels) |
| 1922 | 27.0 | 2,707 | 1931 | 24.1 | 2,576 |
| 1923 | 28.4 | 2,875 | 1932 | 26.5 | 2,931 |
| 1924 | 22.1 | 2,223 | 1933 | 22.6 | 2,399 |
| 1925 | 27.6 | 2,798 | 1934 | 15.8 | 1,461 |
| 1926 | 25.6 | 2,547 | 1935 | 24.0 | 2,303 |
| 1927 | 26.6 | 2,616 | 1936 | 16.2 | 1,507 |
| 1928 | 26.6 | 2,666 | 1937 | 28.3 | 2,651 |
| 1929 | 25.8 | 2,521 | 1938 | 27.8 | 2,562 |
| 1930 | 20.5 | 2,080 | 1939 | 29.4 | 2,602 |

For a number of years prior to and during the base period petitioner dealt in corn futures as a means of insuring a necessary supply of corn and as a protection against short crops and high prices. Some of these futures contracts it utilized for purchases of corn and some it sold, according to crop and market conditions. Profits or losses on futures contracts were credited or debited to cost of sales each year. During the latter part of 1939 and early 1940 petitioner maintained a long position in the corn market of 7 million to 8 million bushels. After the outbreak of World War II in 1939 the price of cane sugar advanced to a point where petitioner no longer needed to maintain this long position, and, accordingly, reduced it to 1,400,000 bushels by the end of 1940. Petitioner's futures transactions on the domestic market

resulted in gains of approximately $82,000 in 1936 and $562,000 in 1937, and losses of approximately $1,018,000 in 1938 and $618,000 in 1939. Petitioner also dealt in the Argentine futures market, sustaining a loss of approximately $248,000 in 1936 and realizing a gain of approximately $27,000 in 1937. These futures transactions were classified as hedging, and not speculation, by the Commodity Exchange Authority.

The following table shows the number of bushels, the total cost, and the average cost per bushel of the corn purchased by petitioner, exclusive of futures contracts, during the base period years:

| Year | Corn purchases (received) | | |
|------|---------|------------|---------------------|
| | Bushels | Total cost | Average per bushel |
| 1936 | 32,882,344 | $26,271,088 | 0.7989 |
| 1937 | 31,996,938 | 31,918,734 | .9976 |
| 1938 | 35,650,773 | 18,951,400 | .5316 |
| 1939 | 36,806,869 | 18,731,786 | .5089 |

The high prices which the petitioner paid for corn in 1936 and 1937 were largely the result of the drought and failure of the corn crop in 1936. The price per bushel increased from 55.9 cents in January 1936 to 108.3 cents in August of that year and continued above $1 per bushel until October 1937. A high point of 133.2 per bushel was reached in April 1937.

The petitioner, like other members of the wet-milling industry, was unable to pass on to its Cerelose and other customers all of the excessive costs of corn in 1936 and 1937 because of the competition from cane and beet sweeteners, which were not affected by the drought.

In the manufacture of Cerelose, starch is converted to sugar liquor which, after various refining processes, passes to the crystallizers. These are long cylindrical drums about 18½ feet long and 9½ feet in diameter with a central shaft to which agitators are attached. They have a 2-inch outside water jacket in which cold water is circulated to cool the liquid. The crystallizers are operated in batteries of 12 or 24. Each battery is operated as a unit. They are also grouped into "first" and "second" crystallizers. About 60 percent of the sugar liquor is crystallized in the first operation and the remainder, in the form of "first greens," is returned to the converters where it is reprocessed. It then goes to the second crystallizers where about 20 percent crystallization takes place, leaving about a 20 percent residue of hydrol (molasses). The second crystallization usually requires 2 to 4 days longer than the first.

The outer water jacket was the only cooling device used by petitioner in its crystallizers prior to 1937. Early in that year petitioner

equipped one of its crystallizers at its Kansas City plant with an auxiliary cooling device, known as a Kilby coil, on a trial basis. The Kilby coil consists of a 4-inch copper pipe installed spirally around the central shaft of the crystallizer through which cold water is circulated during the crystallization process. Petitioner was the first in the corn-milling industry to use the Kilby coil. It had been used successfully in the cane and beet sugar industries.

The use of the Kilby coil at petitioner's Kansas City plant proved successful. It resulted in more rapid and more uniform crystallization and produced a better grade of Cerelose. Crystallization time was reduced from 6½ days to 4 days in the first crystallizers. After the advantages of the Kilby coil were demonstrated petitioner proceeded to install them in its crystallizers at all of its plants. The number of first and second crystallizers in operation at each of petitioner's plants during each month of the 1936–1939 period and the time at which they were equipped with Kilby coils are shown in the stipulated Exhibit 94–4P. At the Kansas City plant there were 66 crystallizers at January 1, 1936, of which 4 were equipped with Kilby coils in 1937, 4 in 1938, and 58 in 1940. At the Argo plant there were 160 crystallizers, 12 of which were equipped with Kilby coils in 1940 and 84 in 1941. At the Pekin plant, which was put in operation in June 1938, there were 67 crystallizers, all of which were equipped with Kilby coils when the plant began operations. Fifty-three more crystallizers with Kilby coils were added in 1939.

The installation of Kilby coils would keep a crystallizer idle for 6 or 7 days. The cost of installation was about $1,200 if done by company employees and about $2,300 if done by contractors.

The average number of hours of curing time in the first crystallizers at each of petitioner's plants during the base period was as follows:

|  | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Argo | 188.71 | 175.27 | 166.68 | 165.14 |
| Kansas City | 193.19 | 201.58 | 164.54 | 165.13 |
| Pekin | | | 196.32 | 186.59 |

Petitioner's annual production of Cerelose in 100-pound bags and the number of days of operation at each of its plants during the base period years, were as follows:

| Date | Argo plant | | Kansas City plant | | Pekin plant | |
|---|---|---|---|---|---|---|
| | Total production | Days operated | Total production | Days operated | Total production | Days operated |
| 1936 | 1,442,865 | 307 | 618,617 | 272½ | | |
| 1937 | 1,606,928 | 283⅔ | 581,563 | 256⅚ | | |
| 1938 | 1,655,040 | 304 | 750,515 | 269⅔ | 285,691 | 157¼ |
| 1939 | 1,653,639 | 308½ | 727,995 | 278⅔ | 654,085 | 260⅓ |

Petitioner decided in the latter part of 1939 to close down its Edgewater, New Jersey, plant, which had been operating unprofitably for a number of years, and transfer its operations to the western plants as soon as this could be done. It was estimated that this would result in savings to petitioner, based on 1938 operations, of about $480,000 a year. To carry out this plan it was necessary to expand and install additional facilities at the other plants. Production of the various commodities manufactured at the Edgewater plant was discontinued gradually and the transfer to the western plants was completed in July 1941.

The cost of the expansion and installation of additional facilities at the western plants amounted to $25,862.27 in 1938, $4,398.39 in 1939, $408,122.44 in 1940, $311,984.90 in 1941, and $997.33 in 1942, a total of $751,365.33.

Since 1926 petitioner has incurred annual "idle-plant expenses" at its Edgewater plant, consisting principally of maintenance, taxes, and insurance in amounts of from over $100,000 to nearly $375,000. These expenses amounted to $112,552.43 in 1936, $120,968.96 in 1937, $144,895.98 in 1938, and $160,000 (estimated) in 1939. The 1939 estimate was included in the Edgewater manufacturing expenses allocated to the various products. In 1940 and 1941 the idle-plant expenses were charged to "Edgewater Liquidation Account" and are included in the "unabsorbed overhead" of $73,785.66 and $188,489.45 for those respective years. Real estate taxes, which were not charged to the liquidation account, were paid on the Edgewater property in the amounts of $109,031.56 for 1940, $102,965.57 for 1941, and $51,905.02 for 1942.

The following table shows petitioner's excess profits net income for the base period years 1936 to 1939, inclusive, and the equivalent of excess profits net income for the prior years 1922–1935, inclusive:

| Year | Excess profits net income or equivalent | Year | Excess profits net income or equivalent |
|---|---|---|---|
| 1922 | $11,695,549.25 | 1933 | $13,864,414.83 |
| 1923 | 11,728,832.71 | 1934 | 8,624,771.10 |
| 1924 | 12,876,264.40 | 1935 | 7,379,952.17 |
| 1925 | 8,478,216.81 | 1936 | 12,425,810.21 |
| 1926 | 13,005,200.19 | 1937 | 7,105,870.63 |
| 1927 | 12,010,352.84 | 1938 | [1] 11,987,933.95 |
| 1928 | 12,901,865.32 | 1939 | 13,283,442.90 |
| 1929 | 18,695,029.71 | | |
| 1930 | 14,585,046.44 | Average 1922–1939 | 11,638,130.80 |
| 1931 | 9,957,097.63 | Average 1936–1939 | 11,200,764.42 |
| 1932 | 8,880,703.31 | | |

[1] Does not include the amount of $63,856.57 representing interest on Federal taxes.

Petitioner's excess profits net income for 1942 and 1943 and its average base period net income and excess profits credit computed under the provisions of section 713 (f) are as follows:

| | 1942 | 1943 |
|---|---|---|
| EPNI | $27,022,903.57 | $19,426,737.63 |
| ABPNI | 13,283,442.90 | 13,389,897.76 |
| EPC | 12,623,727.05 | 12,730,974.44 |

Petitioner paid interest on a Federal income tax deficiency in the year 1938 of $118,215.27 which constitutes a separate class of deduction under section 711(b)(1)(J) and is (1) not a consequence of an increase in petitioner's gross income in the base period or a decrease in the amount of some other deduction in the base period, and (2) is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by petitioner.

Petitioner is entitled to increase its net income for the year 1938, by reason of the disallowance of an abnormal deduction for interest on a Federal income tax deficiency, under the provisions of section 711 (b)(1)(J), I.R.C. 1939, as follows:

| Excess profits tax taxable year | Amount |
|---|---|
| 1940 | $118,215.27 |
| 1942 | 63,856.57 |
| 1943 | 93,243.12 |
| 1944 | 118,215.27 |
| 1945 | 118,215.27 |

OPINION.

*The Drought Issue.*

Petitioner bases its claim for relief under section 722(b)(2) on the drought which occurred in the Corn Belt in 1936 and the resulting excessive costs of corn in the last half of 1936 and in 1937. Respondent concedes that there was a severe drought in the Corn Belt in 1936 which seriously curtailed the domestic corn yield. The price of corn rose from about 55.8 per bushel in the first quarter of 1936 to 103.7 in the last quarter and to a high of 128.3 in the second quarter of 1937. In the latter part of 1937, after estimates of the new crop were in, prices fell back to about 56 cents per bushel. There is no doubt that the drought and the resulting short corn crop caused these sharp advances in corn prices in 1936 and 1937. Petitioner was unable to adjust its prices on corn products to absorb all of the increased costs of corn because of competition from cane and beet sweeteners, which were not affected by the drought. This Court has heretofore recognized that a severe drought which adversely affects a taxpayer's base period income may be a qualifying factor for relief under section 722(b)(2). See *S. N. Wolbach Sons, Inc.*, 22 T.C. 152; *Sartor Jewelry Co.*, 22 T.C. 773; *Buckbee Mears Co.*, 24 T.C. 549; and *Schwarz Paper Co.*, 23 T.C. 605.

There is no merit in respondent's contention that the abnormally high corn prices which petitioner had to pay in 1936 and 1937 and its depressed earnings in that year were the result of normal competition and not of any temporary economic conditions, such as the drought. It is true that competition between corn and cane sweeteners and domestic and imported starches was, and is, a normal and permanent condition. Petitioner, along with the other members of the wet-milling industry, had long since adjusted to this competition. There is no evidence that the competition was any more aggressive or damaging to petitioner in 1936 and 1937 than in other years. The fact is that without the drought there would have been no excessive corn prices and therefore no need for petitioner to price its Cerelose and other products above the normal competitive barriers in order to maintain its profit margins. In our opinion, the drought was a factor which entitles petitioner to relief under section 722(b)(2), if it meets the other requirements of the statute. The extent to which petitioner's base period earnings were depressed by the drought or other qualifying factors and whether a reconstruction of base period income based thereon would result in any relief to petitioner over that available under section 713(f) will be discussed below.

### *The Kilby Coil Issue.*

With respect to this issue petitioner's contention seems to be that if it had been operating with Kilby coils in all its crystallizers during the base period—and it contends that it was committed to that course of action at the end of the base period—its costs of producing Cerelose would have been materially reduced and, consequently, its base period income would have been increased. It claims relief under section 722(b)(4) based on these constructive savings.

In his opening statement counsel for the petitioner stated:

The Government points out very rightly that at the end of the year 1939 we did have unused capacity in our three plants, which were then manufacturing sugar. What the Government misses in the situation, and I will ask them to take note of this, is that the installation of these Kilby Coils permitted us to manufacture sugar more cheaply. As a matter of fact, the witnesses will show that the installation of these coils permitted us to manufacture sugar approximately 20 cents a hundredweight more cheaply than we had under the old method, and it is our contention that had we been so equipped throughout the base period in accordance with this commitment, we could have manufactured sugar more cheaply during the base period.

Respondent contends that the installation of the Kilby coils was not a qualifying change in the character of the business within the meaning of section 722(b)(4); that it did not reduce the cost of production of Cerelose to the extent claimed; and, further, that petitioner may not now, for the first time, claim relief based on savings in the cost of production when no such claim was presented to

the Commissioner and no facts offered in support of such a claim at the administrative level, where the claim was based on a commitment for increase in capacity for production.

In the first place, the evidence does not show that petitioner was committed, by the end of the base period, to the installation of Kilby coils in all of its crystallizers. As to the commitment, the following colloquy between the Court and counsel took place at the beginning of the trial:

THE COURT: The Government doesn't oppose your contention that there was a commitment, the fact of the commitment?

MR. KRAMER: I don't believe so.

MR. LE BLANC: To the extent of this so-called commitment. At the end of 1939 they had actually installed some Kilby Coils. As to that there is no disagreement. I don't know how far the so-called commitment extended. As to that I am not now in a position to reply, sir.

MR. KRAMER: That will be developed, Your Honor, by witnesses.

By the end of the base period petitioner had found that the Kilby coils operated successfully and had installed several of them at its Kansas City plant. It may, at that time, have intended to install them in all its crystallizers, but there was no commitment to such a course of action. The evidence does not show that petitioner was under any obligation to equip all its crystallizers with Kilby coils or that it had any definite plan for doing so. The evidence is that it was proceeding with the changes at its own convenience and without any time schedule. For all the evidence shows, it could have abandoned the undertaking at any time without serious consequences.

Neither do we think that the installation of Kilby coils was primarily for increasing capacity. We have heretofore held that a qualifying commitment under subsection (b)(4) must relate to a "change in the *capacity* for production or operation" (emphasis supplied) and that to qualify for relief under that subsection any change other than one in the capacity for production or operation must have occurred in, or immediately prior to, the base period. *Newburgh Transfer, Inc.*, 17 T.C. 841.

The minutes of meetings of petitioner's advisory board held in 1939 and 1940 show that the matter of increasing the production of Cerelose was considered and rejected. There is considerable doubt that the petitioner would have found a profitable market for all the Cerelose it could have produced with the capacity it already had. There was idle plant capacity both during and after the base period, and inventories of Cerelose became topheavy and had to be reduced from time to time by a temporary reduction in price. Any permanent price reduction would likely have been met by petitioner's competitors, leaving petitioner in no better position than before.

Petitioner took the position in its original claim that the commitment to install the Kilby coils was a change resulting in an increased

capacity for production of Cerelose. However, the adjustment to base period income, which it now seeks, is based on savings in cost of production of Cerelose rather than increased production. Of course, a change in capacity might also result in a lower cost of production and improvement in the product, but, as said in the *Newburgh Transfer, Inc.* case, when considering the applicability of the commitment rule " 'capacity' is the dominating word." There is evidence that up to the end of the base period, and even in 1940, petitioner had no need to increase its capacity for production of Cerelose and no intention to do so.

Petitioner's claim for relief under section 722(b)(4) based on a commitment to install Kilby coils in all of its crystallizers is denied.

### The Edgewater Plant Issue.

Petitioner contends that the closing of its Edgewater plant and the transfer of its operations to the three western plants was a change in the character of the business to which it was committed prior to the end of the base period. It seeks relief under subsection (b)(4), based on the additional base period income that would have been realized under such changed conditions.

Again petitioner misconstrues the application of the so-called commitment rule under subsection (b)(4). As pointed out above, it relates to a change of capacity for production or operation. *Newburgh Transfer, Inc., supra.* No contention is made that the closing of the Edgewater plant affected petitioner's overall capacity for production or that it was intended to do so. It was for the purpose of reducing operating costs which, undoubtedly, it did. In our opinion, petitioner is not entitled to any relief under this issue.

### Quantum of Relief.

Petitioner has submitted a reconstruction of base period income in which the adverse effects of the drought under its subsection (b)(2) claim are computed at $1,732,217 for 1936 and $8,788,389.67 for 1937. These amounts reflect alleged excessive corn costs of $3,709,650.57 in 1936 and $13,394,195.28 in 1937, less recoupments through increased sales prices of corn products of $1,977,433.57 in 1936 and $4,605,805.61 in 1937.

We will not go into the merits of petitioner's computation of its so-called drought "hurt" further than to say that it is understandably slanted to petitioner's needs in a reconstruction of base period income. In our opinion, petitioner has not met the general qualifications for excess profits tax relief set out in section 722(a) and (b) by establishing that the tax computed without the benefit of section 722 results in an excessive and discriminatory tax.

Petitioner's average base period net income computed under section 713(f), $13,283,443 for 1942 and $13,389,900 for 1943, is approxi-

mately $2 million higher than its actual average base period net income and its long-term 1922–1939 average. The 1922–1939 average was $11,638,131 and its base period average $11,200,764. In fact, there are only 3 years in petitioner's history, 1929, 1930, and 1933, when its income exceeded the section 713(f) average base period net income.

The relief which petitioner has gained by application of section 713(f) is ample, we believe, to compensate for any loss of base period income resulting from the effects of the drought. The drought had no effect on petitioner's 1939 earnings to which its section 713(f) average base period net income is limited under section 713(f)(6). Petitioner is not contending for relief under both section 713(f) and section 722. It recognizes that to prevail here it must establish a constructive average base period net income that would yield excess profits credits in excess of those available under section 713(f). This, we think, it has failed to do.

Since the remaining issues relating to the carryback of unused excess profits credit and other adjustments pertain only to a reconstruction under section 722, they do not need to be considered here.

Reviewed by the Special Division.

*Decisions will be entered for the respondent.*

*Jay O. Kramer, Esq.*, and *Gilbert I. Falk, CPA*, for the petitioner.
*Donald W. Geerhart, Esq.*, for the respondent.