LANSBURGH & BRO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31546.    Filed August 20, 1958.

*I. Herman Sher, Esq.*, and *Martin A. Roeder, Esq.*, for the petitioner. *David Kittner, Esq.*, for the respondent.

#### OPINION.

ARUNDELL, *Judge:* The respondent denied petitioner's applications for excess profits tax relief under section 722 of the Internal Revenue Code of 1939, and related claims for refund for the taxable years ended January 31, 1941 to 1946, both inclusive.

The questions presented for decision are whether petitioner is qualified for relief under section 722 (b) (4) by reason of several alleged changes in the character of the business during the base period, and also alleged changes in capacity for production or operation consummated after December 31, 1939, as a result of a course of action to which petitioner was theretofore committed, and petitioner's business did not reach by the end of the base period the earning level which it would have reached had such changes been made 2 years earlier; further, if so qualified, whether petitioner has established a fair and just amount representing normal earnings to be used as a constructive average base period net income.

The evidence in this case was presented before a commissioner of this Court. The commissioner made a report of his findings of fact, which report was served upon the parties on February 27, 1958. The petitioner has filed no objections to the findings as made by the commissioner but has taken exceptions to the failure to make additional findings. The respondent has filed certain objections to the findings

as made which, in our opinion, are without merit and are therefore denied. Both parties have also requested additional findings, including ultimate conclusions, which will be set out herein, to the extent they are granted.

The Court adopts the findings of fact served upon the parties. For the purpose of this opinion, there will be set forth herein only those principal facts and conclusions which are deemed appropriate in the disposition of the case.

The petitioner, a District of Columbia corporation, was organized in 1911, at which time it took over a family partnership business founded in 1860. At all times material herein petitioner was a family-owned corporation engaged in the business of operating a middle-class department store, located in Washington, D. C., catering to the average-income class of people in the Washington metropolitan area. Prior to and during the years involved herein, petitioner's competitors were other Washington department stores (including Woodward & Lothrop, The Hecht Company, S. Kann Sons Company, and Palais Royal), and also numerous so-called specialty stores. Petitioner's base period consisted of its fiscal years ended January 31, 1937, through January 31, 1940.

In 1935 and during the base period years, petitioner's store consisted of about 8, more or less, connected or adjoining buildings located between 7th and 8th and D and E Streets. Its largest and most modern building, having 6 floors and basement, fronted on both 8th and E Streets. South of that building on 8th Street was the so-called little warehouse on which site the South building was later erected. The Bush building, having 6 floors and basement and fronting on E Street, was used mainly as a service building. The 5 old adjoining buildings fronting on 7th Street were of different dimensions, 2 of them having 4 floors and basement and 3 of them having 3 floors and basement. As to the 7th Street buildings, the first floor and basement of the northern building (approximately 18 feet frontage and 47 feet deep) was leased to the National Shirt Shop, and the first floor and basement of the southern building (approximately 25 feet frontage and 97 feet deep) was leased to the McAnn Shoe Store. In October 1939, petitioner executed a new 5-year lease, at a gross rental of $16,500 per annum, for the property used by the shoe store despite the fact that the floor space involved was needed by petitioner.

In 1935 some of petitioner's buildings were in need of modernization and its overall plant facilities were in need of expansion. In 1935 almost every floor of petitioner's store needed more space to provide for better and more efficient layout of departments in relation to one another, for expansion of the floor space of departments which were undersized for development of maximum sales potential, and for put-

ting in additional lines of merchandise as a normal growth in relation to established departments.

Prior to and during the base period years, petitioner's experience was that its fixture setup throughout the store did not permit as free a flow of customer traffic or the opportunity to present merchandise as attractively as petitioner's executives desired. Also, petitioner's experience, in keeping with that of department stores generally, was that overcrowding of customer traffic in any particular area of the store tended to reduce the potential volume of sales in that area and therefore management kept a close watch on dollar sales per square foot of floor space for each department as an indication of the need for additional selling space.

From time to time, prior to and throughout the base period, petitioner's management proposed various ideas and plans for the promotion of a greater total volume of sales and also for changes in personnel, operation, and facilities which were normal procedures for any progressive department store. Further, from time to time during that same period, petitioner's management proposed various plans for substantial changes in operation and for improvement or expansion of petitioner's buildings and facilities. However, the final approval and authorization of any major changes always hinged on the financial problems of petitioner; the insistence of stockholders on a policy of paying liberal dividends as opposed to an accumulation of additions to earned surplus for expansion of the business; and the conservative policy of the board of directors in regard to expansion of plant facilities.

Prior to and during the base period years, no new capital contributions were made by petitioner's stockholders. Over a period of years, petitioner's growth in plant facilities was usually financed with borrowed money, mainly in the form of mortgages on petitioner's real estate. Any improvements or expansion in facilities involving a substantial investment required additional long-term financing. For many years prior to, during, and subsequent to the base period years, petitioner's current operations were financed primarily with bank loans. Petitioner always met its obligations and enjoyed a good line of credit for current needs.

At all times material herein, petitioner's stockholders exercised substantial control over the operation of the business and its financial policies. The group of stockholders representing the majority vote wanted all the dividends they could get and exerted pressure on petitioner's board of directors for a liberal dividend policy. The petitioner's board of directors exercised a dominant influence over the operation of the business and generally adopted conservative policies in regard thereto. The petitioner's executive committee, consisting of several members of the board of directors, concerned itself generally

with the detailed operations of the business. The petitioner's general manager was its chief executive officer in direct charge of the daily operation of the entire store, subject to the control of the board of directors and the executive committee.

From 1931 and at all times material herein, petitioner had the same general manager, Ralph Goldsmith, a member of the Lansburgh family, who was also a member of petitioner's board of directors and executive committee. Goldsmith was a forward-looking executive on the alert for possible changes and expansions which would improve the operations and profits of the business. Prior to and during the base period years, Goldsmith submitted to the board of directors numerous reports as to overcrowded selling space in various departments and the need for various facilities to realize the full sales potential of the store, and he also submitted proposals for modernization and/or expansion of petitioner's buildings and facilities.

Goldsmith was persistent in his proposals for needed changes in operations or improvement and expansion of facilities and, when his recommendations were not approved and authorized by the board of directors, they were subsequently renewed in similar or modified form. In such manner there developed prior to and during the base period years a broad general program for proposed changes in the operation of petitioner's business and for improvement and expansion of its plant facilities. The petitioner, as a corporate entity, however, never became committed to any particular phase of the contemplated program except as its board of directors specifically authorized certain definite changes in the operation of the business or the expansion of facilities at specific times.

Prior to, during, and subsequent to the base period years, petitioner did make numerous changes in regard to both its operations and its plant facilities which are described in detail in the findings of fact served upon the parties and need not be repeated here. In our opinion, some of those changes were normal and routine in the operation of petitioner's department store business. Further, in our opinion, certain substantial changes in capacity for production or operation consummated after December 31, 1939, were not as a result of a commitment, within the meaning of the statute involved, and such changes will be hereinafter discussed.

In our opinion, the record herein clearly establishes that in certain respects petitioner "changed the character of the business" including (1) "a change in the operation or management of the business" during the base period, and (2) a "change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940"; that "the average base period net income does not reflect the normal operation

for the entire base period of the business"; and, further, that "the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had * * * made the change in the character of the business two years before it did so," within the meaning of section 722 (b) (4). In our opinion, the changes which, either separately or certainly when considered altogether, qualify petitioner for relief, may be briefly stated as follows:

(a) During the base period petitioner made several conversions of service space to selling space, including the second floor over the McAnn Shoe Store, a portion of the basement of the Bush building which connected with the first floor of the main building, an area under the 7th Street sidewalk which was devoted to a new department in the basement store and, also, beginning in December 1939 and completed in 1940, petitioner converted 2 areaways to selling space on the second and fifth floors between the main and the Bush buildings. Such additional selling floor space, totaling approximately 9,200 square feet, materially increased the volume of sales and profits.

(b) In May 1937, petitioner commenced the reorganization of its basement store from a more or less "job lot" or distress merchandise operation to a departmentalized basement store carrying complete lines of regular merchandise selling at regular prices in a lower range than the upstairs store. That reorganization required the services of a new and experienced basement store merchandise manager and a period of about 5 years to change completely the merchandising policy and operation of the basement store. It constituted a substantial change in the operation of petitioner's department store business and resulted in an increased volume of sales and profits.

(c) In the latter part of 1939, petitioner received a cost estimate and accepted proposed terms for architectural services for the construction of a new facing on its 7th Street buildings. In April 1940, a contract was let and construction work was completed in 1940. The new store front transformed the several old buildings to the appearance of a single new building, substantially improved the display windows and the quality appearance of the store, and resulted in increased customer traffic which increased the volume of sales and profits, particularly on the first floor. As a part of that improvement, petitioner installed new selling fixtures on the first floor of the store so as to modernize it.

In 1935 petitioner's general manager, Goldsmith, made a report to the board of directors in which he proposed, *inter alia*, replacing the Bush service building with a new 7-story building for selling purposes, adding 1 floor to the corner building at 8th and E Streets for office space, and constructing a 6-story service building (South building) on the site of the little warehouse. In the same report, and if

petitioner could not "adopt such an extensive program," it was alternatively proposed that only the little warehouse be rebuilt, mainly as additional selling space connected with the main 8th Street building. The board of directors appointed a committee "authorized to look into the feasibility of a new South building," and the committee so appointed did, in 1935 and early 1936, make a study of the matter and particularly how the proposed building would be financed. In February 1936, it was reported to the board of directors that it "appears that the mortgage financing is possible and the additional bank loans for the operation of our business can be secured. It, therefore, becomes a question of our own decision whether or not to proceed." Petitioner made no decision to proceed and made no commitments whatever for the construction of the South building during 1936 or thereafter throughout the base period years. It was not until sometime in 1940 or early 1941 that petitioner took definite steps toward the financing and construction of the building expansion completed in 1941, as set out in the next succeeding paragraph.

In 1941, on the site of the 8th Street little warehouse, petitioner constructed its new South building consisting of a basement and 7 floors as an extension of its main 8th Street building. It gave petitioner an additional 19,796 square feet of selling space and 3 new passenger elevators. In connection with that construction work in 1941, petitioner added a fourth floor to the McAnn Shoe Store building, thereby adding 2,500 square feet of new selling space. In 1941, petitioner converted the third floor of the McAnn Shoe Store building from storage to selling space, thereby adding 2,500 square feet of new selling space. In 1941, petitioner added a part of a floor in its 7th Street Fishman building, thereby gaining 500 square feet of new selling space. Those additions of selling space in 1941 were merely the fruition of an expansion theretofore contemplated in petitioner's above-mentioned broad general program for proposed improvement and expansion of plant facilities. Prior to January 1, 1940, petitioner made no change in position and was not committed to make any of those 1941 changes in selling space.

In our opinion, the above-discussed 1941 changes in petitioner's capacity for production or operation of the business were not the consummation of a course of action to which the petitioner was committed prior to January 1, 1940, within the meaning of section 722 (b) (4) and Regulations 112, section 35.722–3 (d).[1] Cf. *Peter J.*

---

[1] Regs. 112, Sec. 35.722–3 (d).—*Commencement or change in character of business.* * * *
  *     *     *     *     *     *     *
The taxpayer must also establish by competent evidence that it was committed prior to January 1, 1940, to a course of action leading to such change. Such a commitment may be proved by a contract for the construction, purchase, or other acquisition of facilities resulting in such change, by the expenditure of money in the commencement of the desired change, by the institution of legal action looking toward such change, or by any other change in position unequivocally establishing the intent to make the change and commitment to a course of action leading to such change. * * *

*Schweitzer, Inc.*, 30 T. C. 42; *Royal Cotton Mill Co.*, 29 T. C. 761; and *Central Produce Co.*, 18 T. C. 267.

The instant case is distinguishable on its facts from the several cases relied upon by petitioner in that in each of those cases some form of definite action was taken by the taxpayer, prior to December 31, 1939, as the actual beginning of the specific change in capacity which was consummated after January 1, 1940. In *Studio Theatre Inc.*, 18 T. C. 548, the taxpayer, prior to December 31, 1939, leased adjoining property for the specific purpose of increasing seating capacity, which unequivocally established the intent to make the changes in capacity consummated after January 1, 1940. In *Springfield Tablet Manufacturing Co.*, 22 T. C. 35, the taxpayer authorized the purchase of machinery for a new product and actually acquired part of the machinery in October 1939, and it was held that there was a commitment for the additional machinery acquired in February 1940. In *Crowell-Collier Publishing Co.*, 25 T. C. 1268, the taxpayer planned a schedule of installations of new printing presses, actually did install 6 presses and conducted a training program for additional operators, all prior to December 31, 1939, and it was held that there was a commitment for 2 additional presses installed in 1941. In *Hydraulic Press Manufacturing Co.*, 27 T. C. 278, the taxpayer decided on a new plant, issued additional capital stock to finance it, and contracted for the design of the plant, all prior to December 31, 1939, and it was held that there was a commitment for the new plant completed in 1940.

The petitioner's average base period net income was $264,808.02. The petitioner's average base period excess profits net income, as finally determined by respondent, for each of the taxable years ended January 31, 1941 to 1946, inclusive, is $228,027.93, $270,072.53, $268,495.57, $274,285.85, $264,899.82, and $287,887.57, respectively.

The petitioner's excess profits credit based on income, as finally determined by respondent, without the application of section 722, is in varying stipulated amounts for each of the taxable years involved herein, ranging from $217,023.34 for the year ended January 31, 1941, to $273,965.19 for the year ended January 31, 1946.

We conclude, and so hold, that petitioner's average base period net income is an inadequate standard of normal earnings and that petitioner's excess profits tax for the years January 31, 1941, through January 31, 1946, computed without the benefit of section 722, results in an excessive and discriminatory tax.

Based on the facts in the voluminous record herein and the application of the 2-year push-back rule, we have used our best judgment in reconstructing a reasonable increased net sales figure and level of earnings which would have been reached as of December 31, 1939, under base period circumstances, in the light of petitioner's qualifying factors. We have used the stipulated index figure of 91.2 for the purpose

of backcasting. In the exercise of our best judgment, we have determined that a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of computing petitioner's excess profits credit is $300,000 for the taxable year ended January 31, 1941; $305,000 for the taxable year ended January 31, 1942; and $310,000 for the taxable years ended January 31, 1943 to 1946, inclusive. The amounts determined for the years ended January 31, 1941 and 1942, result from the application of the variable credit rule, which is appropriate in this case because certain changes were not completed and the full level of normal operations attributable to such changes was not reached prior to the end of those years. A further adjustment for income taxes will be made under Rule 50 for the taxable year ended January 31, 1941.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*