OPINION Keen, Judge: The respondent, in his statutory notice, partially disallowed petitioner’s applications for relief under section 722 of the Internal Revenue Code of 1939 and related claims for refund, and further partially allowed such application for relief. This partial allowance was based on respondent’s determination of petitioner’s qualification under sections 722(b) (1) and (b) (4) and a constructive average base period net income (cabpni) of $3,913,000 applicable to each of the years 1941 to 1945, inclusive, resulting in relief to petitioner over that available under section 713(f) and in an overassessment of excess profits taxes for each of those years. In arriving at such cabpni the respondent determined, for each base period year, the petitioner’s adjusted excess profits net income without benefit of section 722, and reconstructed such net income for each year to the extent affected by his partial allowance under both (b) (1) and (b) (4) and then took the average thereof for those years, as set out in our Findings of Fact. There is no issue herein raised by either party with respect to the correctness of respondent’s determination that petitioner qualified under section 722(b) (1) by reason of a hurricane which resulted in an interruption of normal production and operation, or with respect to respondent’s adjustment therefor in his reconstruction. However, in conjunction with his affirmative pleading that petitioner is not entitled to any relief under subsection (b) (4), respondent herein contends that any reconstruction based on the subsection (b) (1) qualifying factor standing alone results in a cabpni which affords no relief. The petitioner seeks a cabpni substantially in excess of that determined in respondent’s statutory notice, based upon alleged errors in respondent’s partial disallowance of its subsection (b) (4) claims for relief, and also in respondent’s reconstruction of the cabrni determined for purposes of bis partial allowance of relief. Tbe respondent denies error in bis partial disallowance. Further, respondent affirmatively pleads that he erred in his statutory notice in determining a partial allowance of relief, alleging that he erroneously failed to make certain so-called contra-adjustments which would cancel out the subsection (b) (4) adjustments previously allowed and result in a cabpni which would preclude any section 722 relief and eliminate the overassessments. Furthermore, respondent affirmatively pleads error in his determination of petitioner’s excess profits taxes in matters involving so-called standard issues, whereby respondent seeks redetermination of a substantial increase in the excess profits tax liability from which the petitioner sought relief in initiating this proceeding. The section 722 issues involved herein arise only under subsection (b) (4). The applicable statutory provisions of the Internal Revenue Code of 1939 are set forth in the margin.[3] The petitioner has the burden, of proving alleged qualifications in addition to those determined in respondent’s statutory notice and of establishing a fair and just amount to be used as a cabpni in excess of that determined by respondent. The respondent has the burden of proof as to each of his various affirmative allegations of error in his partial allowance of relief. We will discuss the section 722(b) (4) issues involved in such order of arrangement and either separately or collectively as we deem appropriate for the purposes of this opinion. In his statutory notice respondent determined that petitioner qualified under section 722(b) (4) by reason of cost savings based on the additional 25,000-kw steam generating capacity installed at petitioner’s Montville plant in 1937 and on the 15,000-kw steam generating capacity made available to petitioner in March 1938 under the interchange agreement. In his pleadings the respondent alleged error in such determination only with respect to his characterizing the interchange agreement as making available an additional 15,000-kw capacity. There is no issue properly before the Court with respect to the correctness of respondent’s determination as to the additional 25,000-kw capacity installed at Montville, and respondent’s contention on brief that it was merely a normal routine change, not within the scope of subsection (b) (4), serves only to cloud an already complex case. In any event, the facts herein establish that the additional 25,000-kw steam generating facility installed at a cost of $1,892,577 constituted “a difference in the capacity for production or operation” (emphasis supplied) and thus a qualifying factor as a base period change in the character of the business within the meaning of section 722 (b) (4). With respect to the 15,000 kw made available to petitioner in 1938, we are of the opinion that respondent has failed to prove error in his statutory notice determination that it also constituted a similar (b) (4) qualifying factor. The facts establish that the terms of the Stamford interchange agreement and the petitioner’s construction of a 66,000-volt transmission line between Norwalk and Stamford at a cost of $473,810, including $40,000 for the cost of land, made available to petitioner’s system an additional 15,000 kw steam generating capacity in 1938. The record does not support the respondent’s contention herein that there was merely a normal routine arrangement for petitioner’s purchase of a supply of electric energy on a favorable basis instead of additional capacity for petitioner’s production or operation. The above base period changes materially increased the petitioner’s capacity by a total of 40,000 kw for the production of steam-generated electricity which was more dependable to meet daily load requirements than hydroelectric generating facilities, and lowered cost of production of electric energy which directly resulted in a higher level of normal earnings. We conclude that the amounts of such cost savings were properly allowed by respondent as adjustments in the reconstruction of base period income and determination of partial relief under section 722(b) (4). Cf. Bergstrom Paper Co., 26 T.C. 1167, petition for review dismissed (C.A. 7, Jan. 30, 1968), and authorities cited therein. Belated to the next preceding issue is the petitioner’s assignment of error that respondent, having allowed a reconstruction adjustment for cost savings resulting from base period changes in the character of the business, erred in failing to allow cost savings computed on the same basis for steam generating facilities completed after December 31,1939, and alleged to have been committed for by petitioner prior to January 1, 1940. This pertains to the new 25,000-kw generating unit which was authorized and ordered prior to December 31, 1939, and the installation thereof completed at Stamford in October 1941 by the Connecticut Power Co. (not the petitioner herein) to provide additional generating capacity for the integrated system as contemplated by the interchange agreement. The petitioner contends that this was a section 722(b) (4) commitment with respect to the Connecticut Power Co.; that under the interchange agreement such company was obligated to construct the new generating facility and make the additional capacity available to petitioner for production or operation; and that petitioner was obligated to use such additional capacity in its interchange operations with resulting cost savings and, accordingly, the change in capacity was equally committed for by petitioner within the meaning of subsection (b) (4). The respondent contends, inter alia, that to qualify for a subsection (b) (4) commitment the change in capacity consummated after December 31, 1939, must be “as a result of a course of action to which the taxpayer was committed prior to January 1, 1940” (emphasis supplied), and that petitioner, the taxpayer herein, never took any course of action on its own account to authorize, order, and install the new generating unit. The respondent further contends that even though upon completion the new unit was used along with the other generating units of the two companies to carry the daily load requirements of the integrated system under the interchange agreement, nevertheless, a course of action to which another taxpayer was committed may not be imputed to petitioner for the purposes of section 722(b) (4) relief. We agree with the respondent’s contention. The general rules of the relief section 722 contain broad phraseology which has been given liberal construction in determining the applicability of that section to various factual situations presented in claims for relief from alleged excessive and discriminatory excess profits taxes. However, in our opinion, where specific language of that statute denotes requisite requirements, the latter must be squarely met by tbe taxpayer seeking relief. With respect to the subsection (b) (4) commitment rule, we have heretofore held that “capacity” is a word with specific limitations upon the applicability of that rule. Newburgh Transfer, Inc., 17 T.C. 841. We are also of the opinion that the word “taxpayer” specifically limits the applicability of such rule to the taxpayer as the requisite entity which must be committed to making a change in capacity as such. See Barth Smelting Corporation, 30 T.C. 1073. It should be noted that in the instant case the alleged commitment was not for the installation of machinery by or for the sole use of the taxpayer, did not result in the taxpayer obtaining any interest, leasehold, or otherwise in the property to be constructed, and did not create as to the taxpayer the right or obligation to receive a determinable amount of energy. Cf. Southern California Edison Co., 19 T.C. 935. In any event, a (b) (4) qualification under the commitment rule applies only to a change in capacity, Newburgh Transfer, Inc., supra, and any other (b) (4) change in the character of the business must have occurred immediately prior to or during the base period. Corn Products Co., 36 T.C. 969. Here there is no base period event to support the claimed adjustment for additional cost savings relating to the new Stamford 25,000-kw unit completed after December 31, 1939. We sustain the respondent’s dis-allowance of any reconstruction adjustment on this issue. In addition to the above-mentioned increases made by petitioner in the capacity of its own generating facility during the base period, the petitioner also substantially increased the mileage and the voltage of its transmission and distribution lines, and increased the capacity of its transmission and distribution substations during the base period as detailed in our Findings of Fact. Such base period additions to petitioner’s transmission and distribution facilities at a total cost of $6,943,242.97, including some replacements, materially increased petitioner’s capacity for operation and actual operation in delivery of electric energy not only to old customers but to new customers, particularly of the domestic category, which directly resulted in increased sales and a higher level of normal earnings. The petitioner alleges that the respondent, in his reconstruction, erred in failing to allow any adjustment to base period income for increased sales and level of earnings attributable to such changes. The respondent counters with the contention that they were merely normal routing changes not within the purview of section 722(b) (4). In our opinion, these base period changes, separately or certainly when considered altogether, constituted a qualifying (b) (4) base period change in the character of the business as “a difference in the capacity for production or operation.” Cf. Lansburgh & Bro., 30 T.C. 1114, 1118. We hold that respondent erred in failing to make any reconstruction adjustment on account thereof. The petitioner’s various sales-promotion activities and voluntary rate reductions during the base period, as detailed in our Findings of Fact, clearly did not constitute subsection (b) (4) changes in the character of the business, either as “a change in the operation or management of the business” or otherwise, but rather constituted intensified normal activities in petitioner’s growing business. The petitioner alleges that the respondent, in his reconstruction, erred in failing to allow an additional adjustment to base period net income to reflect elimination of alleged abnormal deductions for depreciation in the base period years as compared to deductions for depreciation in the subsequent taxable years. It would serve no useful purpose to set forth the lengthy arguments of the parties. Briefly stated, petitioner contends that having qualified for relief the reconstruction of its normal earnings should eliminate an alleged base period abnormality of excessive depreciation pursuant to respondent’s E.P.C. 6, 1946-2 C.B. 123, and respondent contends that the latter is not applicable to the facts in the instant case. We agree with respondent. In Southern California Edison Co., supra, the respondent in 1943 determined lower depreciation rates than were claimed by the taxpayer on its returns for each of the years 1936-39. The reduced rates were applied for tax purposes both prospectively to later years and retroactively to earlier years, but, because of the statute of limitations, they were given no effect prior to 1939. The reduced rates applied to 1939 were no less appropriate for the earlier base period years and if applied thereto the taxpayer’s depreciation would have been reduced and net income increased by substantial amounts for each of the years 1936-38. For purposes of section 722 the reduced depreciation rates were applied by respondent in determining normal earnings for 1939 but not for the earlier years 1936-38. This Court held that, so far as concerned a reconstruction under section 722, the rates used for 1939 should be used in determining normal earnings for the three earlier base period years as required by E.P.C. 6 for the correction of abnormal depreciation deductions in such earlier years. The date of the respondent’s determination of the reduced depreciation rates was immaterial to the Court’s holding because the actual application thereof to 1939 constituted the occurrence of a base period event. The Court further held that E.P.C. 6 required correction for abnormal interest deductions to the extent that base period net income did not reflect interest savings on long-term debt retirement and refunding which occurred at various times during the base period. However, with respect to the taxpayer’s claim for adjustment for alleged abnormal base period interest deductions as compared to subsequent years where bonds outstanding at the close of 1939 were refunded in 1941 at a lower rate of interest, this Court held that no effect could be given to such transaction in reconstructing the taxpayer’s base period net income because reference to post-1939 events is prohibited by section 722(a). This last holding is, in our opinion, controlling in the instant case on petitioner’s claimed adjustment for alleged abnormal or excessive depreciation allowed for the entire base period as compared with the subsequent taxable years involved. The crux of the factual situation herein is that the petitioner and respondent agreed upon a composite depreciation rate of 3.34 percent as the appropriate rate applicable in determining a reasonable allowance for depreciation for tax purposes for all 4 base period years, and thus there was no abnormality as between any one or more of those years as was true in the Southern California Edison case. Thereafter as a result of inspection of the properties and conferences, the petitioner and respondent agreed to a lower composite depreciation rate of 3.15 percent as the appropriate rate applicable in determining a reasonable allowance for depreciation for different taxable years 1940-45. This was a post-1939 event, which incidentally involved a question of fact relating only to the years 1940-45, and pursuant to the prohibition of section 722(a) no regard shall be had to such event in reconstructing petitioner’s base period net income. The respondent is sustained on his disallowance of the claimed additional adjustment for alleged abnormal depreciation deductions in the base period years. Further, our conclusion on this issue obviates any necessity of passing on the question of whether petitioner is estopped from claiming an adjustment for abnormal depreciation as affirmatively pleaded by respondent. The petitioner alleges that the respondent, in his reconstruction of base period net income, erred in failing to allow an additional adjustment to reflect substantial reductions in interest expense and debt discount and expense. This is a claim for correction of a base period abnormality. Our Findings of Fact set forth in detail the petitioner’s base period refunding of a sizable portion of its long-term bond indebtedness at lower interest and debt expense. The higher interest and debt expense on the old refunded bonds were reflected in petitioner’s level of earnings up to the dates of the respective retirements of the old bonds. The reductions and/or savings in interest and debt expense were only partially reflected in petitioner’s level of earnings during the years 1936,1937, and 1938, but were fully reflected therein for the last base period year 1939. In Southern California Edison Co., supra, where the taxpayer retired long-term indebtedness in each of the base period years thereby reducing the amount of interest payable, this Court said at page 998: Keeping in mind E.P.O. 6, we think petitioner’s average base period net income is abnormally low for failure completely to reflect these reduced interest charges, and that this is an abnormality which requires correction. * * * Cor-reetion is needed only to the extent that the actual earnings do not reflect the interest savings. And, further, where the taxpayer refunded a bond issue in the base period at reduced interest rates, this Court said at page 999: To the extent that petitioner’s average base period net income fails to reflect this reduction in interest, we think it likewise contains an abnormality which requires correction under E.P.O. 6 for essentially the same reasons as obtain respecting the retired indebtedness. * * * In the instant case and on authority of the Southern California Edison case we hold that the claimed abnormality correction may be made but only to the extent that actual base period earnings do not reflect the petitioner’s interest and debt expense savings. The petitioner alleges that the respondent, in his reconstruction of base period net income, erred in failing to reconstruct for an increased level of sales and earnings under the 2-year pushback rule, and further claims application of that rule to certain enumerated events. Based upon a study of the record herein, we are convinced that “the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had * * * made the change in the character of the business two years before it did so,” and, accordingly, “it shall be deemed to have * * * made the change at such earlier time,” but only in regard to petitioner’s qualifying subsection (b) (4) changes. The petitioner is entitled to a reconstruction of an increased level of sales and earnings under the 2-year push-back rule as applied to the hereinbefore-determined qualifying changes in plant facilities completed by petitioner during the base period for increased capacity for production of electric energy, and also for increased capacity for operation of the business in transmission and distribution of electric energy. However, the petitioner is not entitled to the contended-for application of the 2-year pushback rule to the claimed Stamford additional generating capacity as to which we have held petitioner was not committed, or the claimed additional extensions of rural distribution lines which would have been made if all the base period changes in the character of the business had been made 2 years earlier. Since neither of those alleged changes constituted a qualifying factor, there can be no push back thereof. Further, with respect to the additional extensions of rural distribution lines which petitioner claims it would have made with 2 more years’ experience based on other qualifying factors, we are of the opinion that the record fails to establish what, if any, such lines might reasonably have been built. We think the record shows that petitioner’s base period construction of transmission and distribution lines constituted the total that actual base period conditions warranted. As hereinbefore mentioned, the respondent’s partial allowance was based upon a cabpni arrived at through year-by-year reconstruction of base period net income. We find the year-by-year method of reconstruction not only complex, but unnecessary in regard to certain aspects of this case. We find that certain circumstances or matters for which adjustments are claimed by both parties herein were for all practical purposes fully reflected in petitioner’s actual earning level for its last base period year. Accordingly, and based upon a consideration of the whole record, we conclude that the appropriate reconstruction of a oabpni in the instant case should be made on the basis of ascertaining the earning level which petitioner would have reached by the end of 1939, after application of petitioner’s section 722 qualifying factors (including the pushback rule where applicable) to its business operations under existing base period conditions, and backcast with an appropriate index to arrive at a base period average. See 7-Up Fort Worth Co., 8 T.C. 52; Lansburgh & Bro., supra; and Copco Steel & Engineering Co., 31 T.C. 629. Having reached the conclusion set forth in the next preceding paragraph and in connection with the reconstruction for the year 1939, we hold that no adjustments need be made for interest and debt expense savings occasioned by base period refunding of outstanding long-term bonds at lower interest rates or cost savings resulting from more efficient steam-generating facilities which became available during the base period as claimed by petitioner, or for increased interest and debt expense on new additional borrowed capital required to finance base period additions to petitioner’s plant facilities, or for increased insurance, property taxes, and depreciation incurred on such additional facilities, or for increased welfare and pension expenses incurred after 1937 as contra-adjustments claimed by respondent. Furthermore, in connection with respondent’s claimed contra-adjustments, we conclude and hold that respondent has not established his affirmative plea of error in his determination in failing to make an adjustment for an alleged abnormality which would reduce reconstructed base period net income for alleged constructive loss of earnings arising from dividend distributions other than out of earnings and profits for tax purposes. On the record we conclude that respondent has failed to establish a sound factual basis in support of his theory of constructive loss of earnings and, in any event, that respondent’s proposed computation of amounts (in terms of interest on constructive additional borrowed capital in sums equivalent to such dividends), as representing alleged constructive loss of earnings in each base period year, fails to establish any justifiable amounts thereof. The record establishes that after payment of dividends, other than out of earnings for tax purposes, the petitioner had a substantial surplus in each base period year and there is no basis herein for a finding as to what amounts, if any, of constructive borrowings could be said to be attributable to petitioner’s dividend policies. Furthermore, this claimed abnormality adjustment for constructive loss of earnings would result in a double diminution of base period net income because, as above concluded, petitioner’s level of earnings for 1939 reflects deductions for increased interest incurred on additional borrowed capital required to finance base period additions to petitioner’s plant facilities. We hold against respondent on this issue, which has served only to add complexity to the instant case. The respondent affirmatively alleges error in his determination in allowing the petitioner an unused excess profits credit carryover, based on constructive earnings under section 722, from the year 1940 to the year 1941, that is computed on the basis of the cabpni of $3,913,000 determined by respondent under section 722. The burden of this affirmative allegation is simply that if respondent erred in allowing section 722 relief then he further erred in using the cabpni as a basis for computing the excess profits credit for 1940 and the resulting carryover. This issue is dependent upon whether any relief is granted in this proceeding. Respondent’s separate assignment of error, raising the question of the correct amount of any carryover from 1940, will be discussed hereinafter. The remaining so-called contra-adjustment, affirmatively claimed by respondent that he erroneously characterized the Stamford Interchange Agreement as making available an additional 15,000-kw capacity during the base period, has been hereinabove decided adversely to respondent. The petitioner’s actual average base period net income is $3,781,544 while its average base period net income under the “growth formula” of section 713(f) as adjusted by respondent is $3,844,849 for 1941 and $3,854,803 for the years 1942 to 1945, inclusive. In his notice of partial disallowance, the respondent determined that petitioner qualified for relief under section 722 (b) (1) and (b) (4), and further determined a constructive average base period net income of $3,913,000 applicable to the taxable years 1941 to 1945 and also to 1940 for purpose of carryover of unused excess profits credit. Respondent has failed to establish his affirmative allegations that he erroneously allowed any relief. Petitioner claims a cabpni of $5,032,811 based on a reconstruction embracing all the adjustments claimed herein, some of which have been hereinabove decided adversely to petitioner, and, accordingly, such claimed cabpni is not substantiated. However, the petitioner has carried its burden of establishing a basis for determining a fair and just amount representing normal earnings to be used as a cabpni in an amount in excess of its average base period net income computed without regard to section 722. We have found as a fact, and so hold, that petitioner’s average base period net income is an inadequate standard of normal earnings and that petitioner’s excess profits tax for the years involved herein, com-pnted without the benefit of section 722, results in an excessive and discriminatory tax. We have given full consideration to all the facts in the voluminous record herein. We have applied the 2-year pushback rule to petitioner’s (b) (4) base period changes in the character of the business embracing “a difference in the capacity for production or operation” and including increased capacity of generating facilities, high voltage transmission lines and substations, and also increased mileage of transmission and distribution lines, all of which directly resulted in increased sales of electric energy and a higher level of normal earnings. In applying the 2-year pushback rule we have given consideration to petitioner’s own experience in expansion and growth of its business. We have used our best judgment in reconstructing a reasonable amount of increased sales and level of earnings which would have been reached as of December 31,1939, in the light of petitioner’s qualifying factors under base period circumstances. We have applied an appropriate index figure for the purpose of backcasting to obtain a base period average. In the exercise of our best judgment, we have determined that a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of computing petitioner’s excess profits credit based on the income method is $4,300,000 for the taxable years 1941 to 1945, inclusive. Such cabpni is also applicable to the year 1940 for purposes of any carryover of unused excess profits credit based on the income method. A further adjustment for income taxes will be made for the year 1940 in the recomputation under Rule 50. Cf. Copco Steel & Engineering Co., supra, and Lansburgh & Bro., supra at 1121. Standard Issues The respondent’s affirmative pleading that there are no overassess-ments and that there are deficiencies in petitioner’s excess profits taxes for the years 1941 to 1945, inclusive, is premised upon allegations of error in his statutory notice. Respondent’s alleged error in his allowance of any section 722 relief has been decided adversely to respondent in our determination of a cabpni to be used in lieu of petitioner’s average base period net income (otherwise computed without benefit of section 722) for purposes, inter alia, of computing petitioner’s excess profits credit in the recomputation to be made under Rule 50. Respondent’s further allegations of error in the statutory notice, broadly stated for present purposes, pertain primarily to the computation of the allowable excess profits credit and relate to alleged requisite adjustments involving issues other than those arising under section 722, that is, so-called standard issues. This proceeding was initiated under section 732 of the 1939 Code solely by reason of the petitioner’s appeal from respondent’s statutory notice of partial disallowance of its claims for relief under section 722 and for refund of excess profits taxes for the years involved. No deficiencies in such taxes were asserted in the statutory notice and the standard issues have been raised by respondent’s amended answers to the petition herein. Both parties assert that the Court is squarely faced with the question of whether, under the circumstances herein, it has jurisdiction of the several so-called standard issues. Petitioner urges that this Court should continue to follow its position taken in Mutual Lumber Co., 16 T.C. 370, that the Court lacks jurisdiction. Respondent urges that this Court has been consistently reversed on this jurisdictional issue and that we should now follow the decisions of the various Courts of Appeals. CIBA Pharmaceutical Products, Inc. v. Commissioner, 297 F. 2d 77, reversing and remanding 35 T.C. 337; Commissioner v. Seminole Mfg. Co., 233 F. 2d 395; Commissioner v. Blue Diamond Coal Co., 230 F. 2d 312; Commissioner v. S. Frieder & Sons Co., 228 F. 2d 478; Commissioner v. Poe Manufacturing Co., 224 F. 2d 254, reversing and remanding T.C. Memo. 1954-158; Martin Weiner Corp. v. Commissioner, 223 F. 2d 444, reversing and remanding on this issue 21 T.C. 470; Commissioner v. Pittsburgh & Weirton B. Co., 219 F. 2d 259, reversing and remanding 21 T.C. 888; Willys-Overland Motors v. Commissioner, 219 F. 2d 251; Packer Pub. Co. v. Commissioner, 211 F. 2d 612, remanding 17 T.C. 882; Claremont Waste Mfg. Co. v. Commissioner, unreported; City Machine & Tool Co. v. Commissioner, 194 F. 2d 535; H. Fendrich, Inc. v. Commissioner, 192 F. 2d 916. In Dixie Portland Flour Co., 31 T.C. 641, and Air Preheater Corporation, 36 T. C. 982, both involving section 722 claims for relief and standard issues raised by the taxpayers, this Court said it preferred to bypass the controversial jurisdictional question of standard issues by disposing of the latter on the ground that they were without merit. In CIBA Pharmaceutical Products, Inc., 35 T.C. 337, 355, 356, involving section 722 claims for relief and a claimed standard issue deduction, this Court followed Mutual Lumber Co., supra, in holding that it lacked jurisdiction of the standard issue, but further expressed the view that if we had jurisdiction to decide such issue we would decide it for the taxpayer. On appeal on the jurisdictional question the Tax Court was reversed, as above noted. The circuit Court of Appeals, to which this case may go on appeal, has taken the position that the Tax Court has jurisdiction of standard issues raised in a section 722 relief case. Martin Weiner Corp., supra. In Dixie Portland Flour Co., supra, and Air Preheater Corporation, supra, this Court without taking jurisdiction nevertheless considered tlie merits of the standard issues raised and determined them to be without merit. In the instant case the jurisdictional question may not be so bypassed. On the record herein we are persuaded that the standard issues not only have merit, but that the issues involving the correct computation of the allowable excess profits credit require consideration and decision on the merits in order that this Court may make the requisite redetermination of this proceeding. A further consideration herein, with respect to the jurisdictional issue, is that on the record we have concluded and found that petitioner is entitled to a cabpni in an amount greater than that allowed by respondent which, if the only issue herein, would necessarily result in larger excess profits credits and overassessments than those computed in respondent’s statutory notice of partial allowance of relief. Howeverj we are persuaded that the record discloses further error in the statutory notice in that it incorporates incorrect amounts on account of adjustments required by statute in arriving at the excess profits credit based on the income method. The cabpni herein determined constitutes only a part of the basis for computation of petitioner’s allowable excess profits credit. The petitioner is certainly not entitled to a decision, under Rule 50 recomputation, that there are excess profits tax overpayments in any amounts greater than actually overpaid. Upon reconsideration of the long controversial question of this Court’s jurisdiction over standard issues raised in section 722 relief cases, we will no longer follow the rule announced in Mutual Lumber Co., supra. On authority of the decisions of the various circuit Courts of Appeals hereinabove cited, we take jurisdiction of the standard issues properly raised in this proceeding. The petition herein having been filed pursuant to section 732(a) of the 1939 Code,[4] the respondent’s “notice of disallowance shall be deemed to be a notice of deficiency for all purposes relating to the assessment and collection of taxes or the refund or credit of over-payments” and, further, pursuant to section 732(b),[4] if this Court “finds that there is no overpayment of tax” and “further finds that there is a deficiency” this Court “shall have jurisdiction to determine the amount of such deficiency.” Statute of Limitations It is stipulated herein that the petitioner and respondent executed waivers whereby the period of limitations for the assessment and collection of additional taxes for 1941 and 1942 was extended to June 30, 1953, and for the years 1943, 1944, and 1945 was extended to June 30, 1950. On the date of respondent’s notice of disallowance, March 18,1953, there was no bar to the assessment and collection of additional taxes for the years 1941 and 1942, and the respondent’s affirmative assertion of deficiencies for those years, in his amended answers filed herein, is timely. See sec. 272(a). With respect to the asserted deficiencies for the years 1943, 1944, and 1945, as to which petitioner has pleaded the bar of the statute of limitations, it has been held that a deficiency asserted for the first time in respondent’s answer to a petition filed with this Court, based upon a disallowance of a section 722 claim, is untimely if it was barred when the notice of disallowance was mailed. F. W. Poe Manufacturing Co., 25 T.C. 691, affirmed on other grounds 245 F. 2d 8; Commissioner v. S. Frieder & Sons Co., 247 F. 2d 834. See section 275(a) period of limitation; section 276 (b) waivers; section 729(a) laws applicable to excess profits tax. In May Broadcasting Co. v. Commissioner, 299 F. 2d 84, the Court of Appeals for the Eighth Circuit distinguished that case from Commissioner v. S. Frieder & Sons, Co., supra, as follows: “Frieder deals with limitations as to the Government asserting a deficiency. Such issue brings into play statutes not directly involved in the taxpayer’s claim for redetermination in the present case.” If the recent case of Overland Corporation (formerly Willys-Overland Motors) v. Commissioner, 316 F. 2d 777, (C.A. 6, 1963) he considered as holding to the contrary, then, with due deference to the Court of Appeals for the Sixth Circuit, we adhere to the views expressed by us in Overland Corporation, 34 T.C. 1001, and in F. W. Poe Manufacturing Co., supra, and choose to follow the opinion of the Court of Appeals for the Third Circuit in Commissioner v. S. Frieder & Sons, Co., supra. Accordingly we decide that no deficiencies in tax may be assessed or collected for those years. However, as we shall explain more fully later in this opinion, the correct amount of petitioner’s excess profits credits for those years must be determined herein for the purpose of determining the amount, if any, of excess profits tax refunds to which petitioner is entitled, even though this determination requires a consideration of tax liabilities otherwise not collectable by reason of the statute of limitations. Pleadings At the hearing on this proceeding the Court denied petitioner’s motion to strike those paragraphs of respondent’s amended and second amended answers which relate to his affirmative allegations of errors raising standard issues for the taxable years 1941 and 1942 and for 1940 for unused credit carryover purposes, and also affirmative assertions for deficiences for 1941 and 1942. Petitioner’s motion for reconsideration of such ruling was taken under advisement and, upon due reconsideration thereof, the denial of petitioner’s motion to strike, as above set out, is reaffirmed. Further, at the hearing on this proceeding the Court granted the petitioner’s motion to strike paragraph 11 of respondent’s second amended answer. Subparagraphs 11 (1) to (4), inclusive, set forth affirmative allegations of errors in failing to correctly compute petitioner’s net capital additions with resulting errors in determining the amount of the excess profits credit for each of the years 1943, 1944, and 1945, and also affirmative assertions for deficiencies for those years. The Court took under advisement respondent’s motion for reconsideration of such ruling with respect to the second amended answer subparagraph 11(5). The latter is an alternative plea, in the event it is determined herein that petitioner is entitled to section 722 relief, that the Court further determine that petitioner’s corrected net capital additions be used in determining its excess profits tax liability for the purpose of determining whether there is an actual overpayment in excess profits tax for each of the years 1943, 1944, and 1945. Upon due reconsideration of the premises, we are of the opinion that the pleading in said subparagraph 11(5) should be considered and decided on its merits and, accordingly, petitioner’s motion to strike is denied with respect thereto. Unused Credit Carryover In section 722 cases, where this Court grants relief and determines a cabpni and the year 1940 is involved, the adjustment for 1940 income tax has been ordinarily considered a matter for recomputation under Rule 50 rather than consideration on the merits in the opinion. Cf. Copco Steel & Engineering Co., supra, and Lansburgh & Bro., supra. In the instant case respondent affirmatively alleges, and petitioner denies, error in the statutory notice allowance of an unused excess profits credit carryover from 1940 to 1941 in the amount of $257,021.36 based on the income method. In his computation for carryover purposes respondent used petitioner’s excess profits net income as determined in the amomit of $3,460,328.64 for 1940, and allowed an excess profits credit of $3,717,350 (or 95 percent of the cabpni of $3,913,000 allowed by respondent under section 722) resulting in the amount of $257,021.36 as an unused excess profits credit for 1940. Respondent contends that such computation is erroneous in that it is made under the 1939 Code provisions applicable to 1940 instead of those applicable to 1941 which are controlling for carryover purposes and, accordingly, that he erred in failing to adjust petitioner’s excess profits net income as determined for 1940 by adding thereto the income tax of $995,100.92 for 1940, which would result in no unused excess profits credit carryover to the taxable year 1941. Section 711(a) of the 1939 Code, as amended by the Revenue Act of 1940, provided that the excess profits net income would be the normal-tax net income, as defined in section 13(a) (2), with certain adjustments and if the excess profits credit were computed under section 713 (income method) such adjustments included a deduction for income tax as provided in section 711(a) (1) (A). However, the Revenue Act of 1941 amended section 711(a) (1) (A) to eliminate any deduction for income tax. See S. Rept. No. 673, to accompany H.R. 5417 (Pub. L. 250), 77th Cong., 1st Sess., p. 14 (1941). The Revenue Act of 1941 also amended 1939 Code section 710(c)(2) which sets forth the definition of unused excess profits credit and provides, in part, that “For such purpose the excess profits credit and the excess profits net income for any taxable year beginning in 1940 shall be computed under the law applicable to taxable years beginning in 1941.” See also Regs. 112, sec. 35.710-3. In the instant case we have determined that petitioner is entitled to a cabpnt of $4,300,000 which is applicable to the year 1940 for carryover purposes only. The computation of any unused excess profits credit for 1940 for purposes of carryover to 1941 will be made pursuant to the law applicable to 1941 in the recomputation under Rule 50. The issue with respect to an alleged further adjustment in computing the excess profits credit for 1940 for carryover purposes, and involving an alleged correction for net capital reduction, will be discussed in connection with respondent’s claimed adjustment for net capital reduction or addition for the taxable years 1941 to 1945, inclusive. Excess Profits Credit Adjustment for Net Capital Addition or Reduction Under the section 722 issue herein we have determined a cabpni of $4,300,000 and pursuant to section 722(a) the petitioner’s excess profits “tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter.” (Emphasis supplied.) Insofar as applicable herein, section 713 of the 1939 Code[5] is essentially the same for all of the years involved herein. Pursuant to the provisions of section 713(a) (1) (A), (B), and (C), the petitioner’s excess profits credit based on income is computed as 95 percent of the average base period net income (the cabpni herein), plus 8 percent of the net capital addition or minus 6 percent of the net capital reduction as defined in subsection (g). Briefly stated for our purposes, subsection (g) (1) defines net capital addition as the excess, divided by the number of days in the year, of the aggregate of daily capital addition over the aggregate of daily capital reduction for each day of the taxable year, and subsection (g) (2) defines net capital reduction as the converse thereof. Subsection (g) (4) provides that the daily capital reduction for any day of the taxable year shall be the aggregate of the amounts of distributions to shareholders, not out of earnings and profits, after the beginning of the taxpayer’s first taxable year under the excess profits tax law and prior to such day. The respondent affirmatively alleges error, which petitioner denies, in the statutory notice computation of the petitioner’s allowable excess profits credit for each of the years 1940 to 1945, in that he failed to make the required plus or minus adjustment to the credit on account of petitioner’s correct net capital addition or reduction. Respondent further alleges that such error results from his failure to determine the correct amount of “the daily capital reduction,” as required by section 713(g) (4), on account of petitioner’s distributions not out of earnings and profits in the form of “dividends.” There is no dispute as to the facts herein that petitioner had' no accumulated earnings on January 1,1940, and had a deficit in its earnings and profits for tax purposes for each of the years 1940 to 1945, inclusive; and, further, that petitioner made quarterly distributions to its stockholders in the form of “dividends” on its preferred and common stock in the amounts and on the dates during those years as set forth in revenue agents’ reports included herein by reference. The revenue agent’s report, Exhibit YYY herein, embraces schedules showing respondent’s computations of petitioner’s net income and the various adjustments thereto, including deductions for income tax for 1940 and income and excess profits tax for 1941 to 1945, inclusive, in arriving at petitioner’s earnings and profits for tax purposes available for distribution. As therein computed, the petitioner made substantial distributions not out of earnings and profits for tax purposes during each of the years 1940 to 1945, inclusive. In respondent’s statutory notice the petitioner’s distributions, not out of earnings and profits for each of the years 1940-42, were treated as not giving rise to a capital reduction until the following year while on the other hand such distributions for each of the years 1943-45 were treated as giving rise to a capital reduction in the year of distribution. Respondent asserts that his determinations for the years 1940-42 were clearly erroneous. Respondent further asserts that while his treatment of distributions not out of earnings for the years 1943-45 was correct, he erroneously understated the amount of capital reduction for each year because of the error as to the prior years 1940-42 and the cumulative effect of capital reductions for distributions not out of earnings since the first excess profits tax taxable year. See Regs. 112, sec. 35.113-2(a). Petitioner asserts that for all years involved herein its earnings before taxes were in excess of dividends paid. Petitioner contends that in determining its excess profits credit with adjustments for capital changes as provided in section 713, based on the income method, the computation of the amount of dividend distributions not out of earnings for purposes of the capital reduction under subsection (g) (4) should be consistent with the provisions of section 718, relating to the computation of excess profits credit based on invested capital, which expressly prohibits the deduction of the current year’s taxes in determining the current year’s earnings and profits available for distribution. The petitioner’s above contention has been heretofore considered and decided adversely to it. In ABC Brewing Corporation, 20 T.C. 515, 528-530, aff'd. 224 F. 2d 483, we held that section 713 contains no provision similar to that found in section 718 and, further, in the computation of the excess profits credit under the income method that respondent properly reduced the taxpayer’s earnings for the taxable year by the amount of accrued taxes for that year in arriving at earnings and profits available for distribution for purposes of determining the taxable year’s capital reduction under section 713 (g) (4). The respondent asserts an additional error in his method of computation of the capital reduction for each year involved on account of petitioner’s distributions not out of earnings and profits, pursuant to section 713 (g) (4). In the computations on which the statutory notice was based respondent determined that current earnings were first exhausted by the earliest distributions during the year before determining the time at which distributions not out of earnings were paid. Eespondent now contends that current earnings remaining after the making of distributions in the form of “dividends” on preferred stock should be prorated to each quarter, with a resulting adjustment for daily capital reduction occurring at the time of each quarterly distribution in the form of “dividends” on common stock in the amount that each quarterly common stock distribution exceeded the proportion of total earnings or profits attributable to that quarter. Eespondent alleges that the method of proration he now contends for would serve to further increase the amount of the daily capital reduction for each of the years 1940 to 1945, inclusive. Section 115(a) of the 1939 Code defines the term “dividend,” in part, as any distribution made by a corporation to its shareholders “out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made,” and section 115 (b) provides, in part, that “every distribution is made out of earnings or profits to the extent thereof.” Under the facts of record and the cited statutory provisions the respondent has failed to establish any basis for prorating current earnings to each quarterly distribution for determining the capital reduction for each year. On this issue we hold against respondent. We conclude and hold in the instant case that in determining petitioner’s allowable excess profits credit based on income under the provisions of section 713(a) (1) (A), (B), and (C), the computation of the amount of capital reduction provided for in section 713(g) (4) embraces petitioner’s distributions not out of earnings and profits made in each taxable year as hereinbefore decided, and also such distributions for the excess profits tax years prior thereto. Accordingly, we further conclude and hold that in arriving at the excess profits credits allowed in the statutory notice for the years involved, the respondent erroneously computed the amount of the capital reduction by failing to include therein the current year’s distributions not out of earnings and profits for the year 1940 (for purposes of unused credit carryover) and the taxable years 1941 and 1942, and also the cumulative effect if any of such errors on the computations of the capital reduction for each of the subsequent years 1943, 1944, and 1945. Since the correct amount of petitioner’s excess profits tax for each of the years involved is at issue herein, the appropriate adjustments to the excess profits credit for each year will be made in the Rule 50 recomputation. Further, such recomputation will necessarily embrace the matter of whether respondent erroneously scheduled over-assessments in excess profits taxes for the years 1941 and 1942 as affirmatively pleaded by respondent in connection with this issue. We come to the last standard issue herein with respect to the excess profits credit as adjusted for net capital addition or net capital reduction and involving the question of the computation of the corrected capital reduction under section 713(g) (4), as hereinabove decided, to the extent applicable to the years 1943, 1944, and 1945. This is an alternative issue affirmatively asserted by respondent in the event this Court allows petitioner section 722 relief and despite the bar of the statute of limitations to the assessment and collection of any deficiency in excess profits tax for those years. Respondent contends that the bar of the statute of limitations is an entirely separate issue having no bearing on the Court’s jurisdiction to redetermine the petitioner’s correct tax liability for the years before it even though assessment and collection of any deficiency would be barred. Respondent’s position is that since the years 1943, 1944, and 1945 are before the Court for redetermination of petitioner’s claims for relief and refund of excess profits taxes, the Court’s jurisdiction over those matters necessarily embraces jurisdiction to redetermine the correct amount of petitioner’s allowable excess profits credit for each of those years to the extent necessary to determine the amount, if any, of the refund of excess profits taxes to which petitioner is entitled. We agree with that contention. Here the respondent contends that petitioner’s excess profits credit must be recomputed to reflect the corrected capital reduction under section 713(g)(4) in redetermining petitioner’s excess profits tax liability for the years 1943, 1944, and 1945 for the purpose of the Court’s decision in this proceeding as to whether any net overpay-ments of excess profits taxes actually exist for those years. Respondent relies on the doctrine announced in Lewis v. Reynolds, 284 U.S. 281. In that case the taxpayer filed a claim for refund of income tax grounded upon respondent’s disallowance of claimed deductions. The respondent rejected the claim for refund on the basis that he had previously allowed an improper deduction and that a correct recomputation of the tax liability resulted in additional tax which was barred from assessment by the statute of limitations. The taxpayer contended that respondent lacked authority to redetermine and reassess the tax after the statute had rmi. The trial court upheld the respondent and its judgment was affirmed by the circuit Court of Appeals which was affirmed by the Supreme Court. In its opinion the Supreme Court quoted with approval the following language of the Court of Appeals: The above quoted provisions clearly limit refunds to overpayments. It follows that the ultimate question presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. This involves a redetermination of the entire tax liability. While no new assessment can be made, after the bar of the statute has fallen, the taxpayer, nevertheless, is not entitled to a refund unless he has overpaid his tax. The action to recover on a claim for refund is in the nature of an action for money had and received, and it is incumbent upon the claimant to show that the United States has money which belongs to him. The Supreme Court further stated that: While the statutes authorizing refunds do not specifically empower the Commissioner to reaudit a return whenever repayment is claimed, authority therefor is necessarily implied. An overpayment must appear before refund is authorized. Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded. Bonwit Teller & Co. v. United, States, 283 U.S. 258, says nothing in conflict with the view which we now approve. In our opinion the decision in the Lewis v. Reynolds case is con-troiling here, where petitioner seeks excess profits tax refunds, the amounts of which are dependent upon a recomputation of its excess profits tax liability and the allowable excess profits credit. If the recomputation herein is based in part on erroneous adjustments it would result in an erroneous credit not in accord with the statutory requirements of section 713(a) (1) (A), (B), and (C). Accordingly, we conclude that the Rule 50 recomputation herein must reflect the corrected capital reduction in order to arrive at petitioner’s allowable excess profits credit and the amounts of any actual overpayments for the years 1943, 1944, and 1945. Reviewed by the Special Division as to the 722 issues. Reviewed by the Court as to non-722 issues. Decision will be entered under Rude 50 Withey, J., dissents on Issues 6 and 7. Scott, </., did not participate in the consideration or disposition of this case. SEC. 722. GENERAL RELIEF — CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME. (a) General Rule. — In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 81, 1939, except that, in cases described in the last sentence of section 722(b)(4) and in section 722(c), regard shall be had to the change in the character of the business under section 722(b)(4) or the nature of the taxpayer and the character of its business under section 722(c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income. (b) Taxpayers Using Average Earnings Method. — The tax computed under this sub-chapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because— ******* (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purpose of this subparagraph, the term “change in the character of the business” includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation * * *. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, * * * shall be deemed to be a change on December 31, 1939, in the character of the business, * * * SBC. 732. REVIEW OP ABNORMALITIES BY BOARD OP TAX APPEALS [NOW THE TAX COURT OP THE UNITED STATES]. (a) Petition to the Board. — If a claim for refund of tax under this subchapter for any taxable year is disallowed in whole or in part by the Commissioner, and the disallowance relates to the application of section 711(b)(1) (H), (I), (J), or (K), section 721, or section 722, relating to abnormalities, the Commissioner shall send notice of such disallowance to the taxpayer by registered mail. Within ninety days after such notice is mailed (not counting Sunday or a legal holiday in the District of Columbia as the ninetieth day) the taxpayer may file a petition with the Board of Tax Appeals for a redetermination of the tax under this subchapter. If such petition is so filed, such notice of disallowance shall be deemed to be a notice of deficiency for all purposes relating to the assessment and collection of taxes or the refund or credit of overpayments. (b) Deficiency Pound by Board in Case of Claim. — If the Board finds that there is no overpayment of tax in respect of any taxable year in respect of which the Commissioner had disallowed, in whole or in part, a claim for refund described in subsection (a) and the Board further finds that there is a deficiency for such year, the Board shall have jurisdiction to determine the amount of such deficiency and such amount shall, when the decision of the Board becomes final, be assessed and shall be paid upon notice and demand from the collector. SEC. 713. EXCESS PROFITS CREDIT — BASED ON INCOME. (a) Amount of Excess Profits Credit. — The excess profits credit for any taxable year, computed under this section, shall be— (1) Domestic corporations. — In the case of a domestic corporation— (A) 95 per centum of the average base period net income, as defined! in subsection (d), (B) Plus 8 per centum of the net capital addition as defined in subsection (g), or (C) Minus 6 per centum of the net capital reduction as defined in subsection (g). ******* (g) Adjustments in Excess Profits Credit on Account of Capital Changes.— For the purposes of this section— (1) The net capital addition for the taxable year shall be the excess, divided by the number of days in the taxable year, of the aggregate of the daily capital addition for each day of the taxable year over the aggregate of the daily capital reduction for each day of the taxable year. (2) The net capital reduction for the taxable year shall be the excess, divided by the number of days in the taxable year, of the aggregate of the daily capital reduction for each day of the taxable year over the aggregate of the daily capital addition for each day of the taxable year. ******* (4) The daily capital reduction for any day of the taxable year shall be the aggregate of the amounts of distributions to shareholders, not out of earnings and profits, after the beginning of the taxpayer’s first taxable year under this subchapter and prior to such day.